**In re Darrell Lee TESSIER, and Sharon Yvonne Tessier, Debtors.**

**Bankruptcy No. 94–31615–13.**

United States Bankruptcy Court,
D. Montana.

Dec. 8, 1995.

Nancy K. Moe, Harold V. Dye, Missoula, Montana, for the Debtors.

Doug James, Billings, Montana, Special Counsel for Debtors.

Marc D. Stern, American Jewish Congress, New York City (Oliver S. Thomas, Special Counsel, National Council of Churches, Maryville, TN, J. Brent Walker, Baptist Joint Committee on Public Affairs, Washington, DC, Steven T. McFarland, Center for Law and Religious Freedom, Christian Legal Society, Annandale, VA, Richard Stone, Aaron Raskas, Union of Orthodox Jewish Congregations of America, New York City, Michael Farris, Home School Defense Association, Paeonian Springs, VA, Samuel Rabinove, Richard Foltin, American Jewish Committee, New York City, Elliot Mincberg, People for the American Way, Washington, DC, Steven R. Shapiro, American Civil Liberties Union, New York City, David Zwiebel, Agudath Isreal, New York City, of counsel), for Amici Curiae.

Robert G. Drummond, Great Falls, Montana, Chapter 13 Standing Trustee.

Frank W. Hunger, Assistant Attorney General, Sherry Scheel Matteucci, United States Attorney, Victoria L. Francis, Assistant U.S. Attorney, Billings, Montana, Dennis G. Linder, Theodore C. Hirt, Janis C. Kestenbaum, U.S. Department of Justice, Civil Division, Washington, DC, for United States.

## ORDER

JOHN L. PETERSON, Chief Judge.

In this Chapter 13 case, Debtors Darrell Lee Tessier and Sharon Young Tessier ("the Tessiers") filed on February 28, 1995, a Chapter 13 Plan ("the Plan") which included a charitable contribution to their church of $100.00 per month. The Chapter 13 Trustee ("the Trustee") objected to the Plan on June 26, 1995, for, *inter alia,* not committing 100% of the Tessiers' disposable income to the Plan, as required for confirmation under 11 U.S.C. § 1325(b)(1)(B) and *In re Lees,* 192 B.R. 756, 14 Mont.B.R. 181 (Bankr.D.Mont. 1994). In a response filed June 30, 1995, the Tessiers aver the Religious Freedom Restoration Act ("RFRA" or "the Act"), Pub.L.No. 103–141, 107 Stat. 1488 (1993), *codified at* 42 U.S.C. § 2000bb, and the Free Exercise Clause of the First Amendment of the U.S. Constitution, except their contributions from the holding set forth in *Lees* that religious

offerings are not proper disposable net income expense items.

After respective positions on these issues were briefed, the Trustee filed notice, pursuant to 28 U.S.C. § 2403(a) and F.R.Civ.P. Rule 24(c) of an intention to challenge the constitutionality of RFRA. Subsequently, on September 8, 1995, hearing on the factual issues in question was held, in which Sharon Young Tessier appeared represented by counsel and offered testimony supporting the sincerity of the Tessiers' religious beliefs, the centrality of the Tessiers' religious contributions to the exercise of their beliefs, and the burden a ruling preventing them from their giving to their church would inflict. On September 25, 1995, the United States Attorney for the Department of Justice ("USA") filed a notice of the Justice Department's intention to defend the constitutionality of RFRA. The Coalition for the Free Exercise of Religion ("CFER"), submitted through counsel on September 29, 1995, a brief amicus curiae on the constitutionality issue. Finally, on October 30, 1995, the USA filed its brief in intervention.

Memoranda having thus been filed by the parties on the allowance in Chapter 13 of charitable religious contributions, on the application of RFRA and on the issue of RFRA's constitutionality, the Trustee's objection stands ripe for decision. The Court finds that the rule of *Lees* applies to the facts at bar, and that although application of RFRA would nullify the *Lees* rule, RFRA violates the central holding of *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), and the constitutional doctrine of separation of powers, and is therefore void. Consequently, the Chapter 13 Trustee's objection to the Tessiers' charitable giving as in violation of the disposable income requirements of Chapter 13 Plan confirmation is sustained.

1. 11 U.S.C. § 1325:

§ 1325. Confirmation of plan.

(b)(1) If the Trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

\* \* \* \* \* \*

(B) the plan provides that all of the debtor's projected disposable income to be received

Having fully reviewed the briefs, the array of arguments asserted therein, and the record in its entirety, the Court finds that it must address the following dispositive issues to reach its conclusion. First, may the Tessiers' charitable religious contributions be excluded from disposable income under the Court's construction of 11 U.S.C. § 1325(b)(1)(B) and (b)(2),[1] as articulated in *Lees*, when the Tessiers propose to contribute $100.00 per month to their church as reasonable family maintenance, while under their Plan, unsecured creditors receive nothing whatsoever? Second, if the Plan fails under *Lees*, does RFRA have any effect on that outcome? Third, if RFRA does allow the Tessiers to exclude their religious donations from disposable income, does RFRA pass the constitutional test?

The Court findings on these issues may be outlined thus:

(1) The Tessiers' sincere religious beliefs dictate they must make offerings to their church;

(2) Under *Lees*, the Tessiers' religious contributions prevent confirmation of their Plan;

(3) Under RFRA, denial of Plan confirmation constitutes a substantial burden on the Tessiers' religious practice;

(4) Furthermore, under RFRA, while the government has an important interest in the Bankruptcy Code as enforced by *Lees*, its interest is not compelling when weighed against the Tessiers' religious exercise interest;

(5) RFRA therefore overrules *Lees;* however,

(6) RFRA violates the Supreme Court's holding in *Smith*, 494 U.S. 872, 110 S.Ct. 1595, by ignoring the decision's conclusion that it lacks the institutional competence to apply the *Sherbert* test; and

in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor;

(7) RFRA violates the separation of powers doctrine articulated in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) by attempting to force the courts to use a judicially unmanageable test;

(8) RFRA is therefore void, the holding of *Lees* stands, and under 11 U.S.C. § 1325(b), the Tessiers' Plan cannot be confirmed.

## I.

The Tessiers filed a voluntary Chapter 7 petition on November 10, 1994, together with complete Schedules and Statement of Affairs. On January 31, 1995, upon motion by the Tessiers, the Court ordered the matter converted to a Chapter 13 bankruptcy. The Tessiers filed their Plan June 30, 1995, proposing 60 monthly payments of $300.00 per month, with no proposed payment to unsecured creditors.

The Tessiers own exempt real property worth $10,200.00, and chiefly exempt personal property worth $18,845.00, all of which they will retain under their Plan. Their Schedules also show priority and general unsecured claims of $63,745.59 arising from a variety of governmental, consumer, medical and business creditors. The Tessiers list a combined net monthly income of $1,610.00 per month. Their Schedules originally included as current monthly expenses a home mortgage payment of $236.56 per month on real property worth $10,200.00, and a payment on a snowmobile used in Darrell Tessier's work as a hunting guide of $116.22. These the Tessiers subsequently paid, leaving a total of $1,785.39 per month in living expenses. The Tessiers spend only $200.00 per month on food, and nothing whatsoever on entertainment, recreation or cable television. They have no telephone or electrical utility service. Nor do they carry health or life insurance. Frugal as their personal living expenses may be, however, the Tessiers have consistently made, since 1981, charitable contributions to the Cabinet Mountain Bible Church ("CMBC"), and they propose to

continue to make offerings of $100.00 per month for the duration of their Chapter 13 Plan.[2]

At hearing Sharon Young Tessier ("Sharon") testified to the religious conviction which causes the couple to give money to the CMBC as an integral part of their worship and membership there. Although Sharon indicated that the church would welcome and fully accept the Tessiers' membership with or without their monetary offerings, the Tessiers sincerely believe it is their biblically commanded duty to donate a portion of their income to the church as part of the exercise of their religious faith. The Tessiers have acted upon their convictions in this way since first attending the church in 1981, and they profess that their faithful adherence to the word of their God is "contingent" upon giving money to their church. The Court finds Sharon's testimony sincere, heartfelt and fully credible, and the Trustee presented no evidence to dispute it.

## II.

■ A. In the Chapter 13 bankruptcy case of *In re Lees,* the Court faced the issue of whether debtors' charitable contributions to their churches constitute disposable income under 11 U.S.C. § 1325(b). *Lees, supra,* 14 Mont.B.R. 181 (Bankr.D.Mont.1994). In *Lees,* the debtors wished to pay $150.00 per month on a plan that failed to pay 100% of the unsecured creditors' claims, and yet contribute $200.00 per month to their church. In denying the debtors' plan, the Court held that where unsecured creditors are to receive nothing or substantially less than the amount of their claims, allowing charitable contributions under a Chapter 13 plan violated § 1325(b), concluding charitable contributions, religious or nonreligious, "should not be considered a reasonable living expense." *Id.* at 185. To hold otherwise would compel creditors "to make de facto contributions" to the benefitted charity, and undermine the equity, "integrity and credibility of Chapter 13 reorganization." *Id.* (quoting *In re Packham,* 126 B.R. 603, 610 (Bankr.D.Utah 1991)).

---

**2.** The litigants have labeled these contributions a "tithe." A tithe is a tenth part of one's income given for charitable or religious purposes. *Black's Law Dictionary* 1484 (6th ed.1990). The

amount in question here, it should be noted for precision, is something less than one tenth of the Tessiers' gross income.

In reaching its conclusion, the Court found that the debtors' church did not require regular donations or tithes as a condition of membership in good standing. Yet, the debtors' sincere belief and long-standing practice was to give regularly, and the co-debtor attested to an intention to continue to give, even if to do so would scuttle the Chapter 13 plan. Given the contradiction in official church doctrine and the individual debtors' belief and practice, the opinion highlighted the predicament faced by courts when determining whether a personal conviction to make religious offerings is sufficiently bona fide to enjoy an exception from the broad cast of "§ 1325(b)'s 'disposable income' net." *Id.* at 184. Quoting with approval a Utah Bankruptcy Court decision, the Court found insurmountable the inherent difficulties of resolving what amounts to, at least in part, a dispute between the debtor and the church over the moral necessity of tithing. *Id.* (citing *Packham,* 126 B.R. 603, 610 (Bankr.D.Utah 1991)). On matters affecting personal salvation, as when parishioners disagree with their parishes, " 'such [adjudications] are not for [secular] courts to make.' " *Id.*

The Court solved this problem by adopting a construction of § 1325(b) that includes as disposable income all charitable contributions, both secular and sectarian. *Id.* at 183–184. Recognizing that courts are split on whether to consider religious contributions reasonable living expenses outside § 1325(b)'s definition of disposable income, the Court agreed with the majority rule that only if § 1325(b) applies "neutrally to church and charitable donations," does its interpretation not involve the Court in determining whether the debtors' personal commitment to making religious offerings is sufficient to create an exception to § 1325(b), a task the

Supreme Court found courts incompetent to perform. *Id.* (citing *Smith, supra,* 494 U.S. at 886–887, 110 S.Ct. at 1604–1605); *accord, Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–2149, 104 L.Ed.2d 766 (1989); *Thomas v. Review Bd. of Indiana Employment Security Div.,* 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981) ("Courts are not arbiters of scriptural interpretation").

**B.** Objecting to both the analysis the Supreme Court employed and the result obtained in *Smith, supra,* 494 U.S. 872, 110 S.Ct. 1595, Congress enacted RFRA. 42 U.S.C.S. § 2000bb[3]; *see, e.g.,* Joanne C. Brant, *Taking the Supreme Court at its Word: The Implications for RFRA and Separation of Powers,* 56 Mont.L.Rev. 5 (1995). The sponsors expressly designed the bill to "restore" the interpretation of the Free Exercise Clause first articulated in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and later employed in *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). RFRA § 2, 42 U.S.C. § 2000bb (1988 & Supp. V 1993). RFRA commands that before worshipers may invoke the Act to interfere with the application of a federal statute, they must satisfy two elements. First, the challenged statute must burden their exercise of religion. RFRA § 3(a), 42 U.S.C. § 2000bb–1 (1988 & Supp. V 1993). Second, if application of the challenged statute does in fact burden the exercise of worshipers' individual faiths, it must cause substantial burdens upon that exercise. *Id.* The first two elements established, the onus then falls upon the government to show that when weighed against the First Amendment interests of the claimants, enforcement of the law in question advances a compelling government interest by the least restrictive means.

---

**3.** The Act provides in part:

*Free exercise of religion protected*

 (a) In general—Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

 (b) Exception—Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

 (1) is in furtherance of a compelling governmental interest; and

 (2) is the least restrictive means of furthering that compelling governmental interest.

 (c) Judicial relief—A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

RFRA § 3(a), 42 U.S.C. § 2000bb–1 (1988 & Supp. V 1993), *Sherbert, supra*, 374 U.S. at 406, 83 S.Ct. at 1795. Should the government fail to show either of the third and fourth elements, RFRA provides relief. RFRA § 3(a), 42 U.S.C. § 2000bb–1 (1988 & Supp. V 1993).

■ Applying the first two elements of this test, the Ninth Circuit Court of Appeals has held that in order to substantially burden an exercise of religion, a statute must interfere "with a tenet or belief that is central to religious doctrine." *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir.1987) (citing cases, including *Thomas, supra*, 450 U.S. at 717–18, 101 S.Ct. at 1431–1432). Obviously, this standard contemplates a court's determination of whether and to what extent an individual's religious practice resonates from a religious tenet or belief, and whether and to what extent the religious tenet or belief is or is not central to some religious doctrine.

■ As to the compelling government interest element, only interests of "the highest order and . . . not otherwise served can overbalance legitimate claims to the free exercise of religion" and justify a substantial burden on religious observance. *Yoder, supra*, 406 U.S. at 215, 92 S.Ct. at 1533. "In this highly sensitive constitutional area 'only the gravest abuses, endangering paramount interests, give occasion for permissible limitation' " of first amendment rights, such as the free exercise of religion. *Sherbert, supra*, 374 U.S. at 406, 83 S.Ct. at 1795 (quoting *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 322–323, 89 L.Ed. 430 (1945)).

Although in the years succeeding *Sherbert* there have been decisions that have appeared to weaken this standard, these cases involved the interests of government taxing authorities not in question at bar. *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), *Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). Moreover, in more recent cases, the Supreme Court has articulated an exacting standard. Courts must not interpret "compelling government interest" so as to "water [the standard] down," but so as to ensure it "really means what it says." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, ——, 113 S.Ct. 2217,

2233, 124 L.Ed.2d 472 (1993) (quoting *Smith, supra*, 494 U.S. at 888, 110 S.Ct. at 1605 in striking down a non-neutral statute directly targeting a religious practice).

This mandate gives lower courts little guidance in defining compelling government interests. Nonetheless, some more concrete illustrations found to be compelling include government's interests in national defense, in public safety in general and in public school safety in particular. *Gillette v. United States*, 401 U.S. 437, 462, 91 S.Ct. 828, 842–843, 28 L.Ed.2d 168 (1971); *Yoder, supra*, 406 U.S. at 213 & 230, 92 S.Ct. at 1532, 1540–1541; *Sherbert, supra*, 374 U.S. at 403, 83 S.Ct. at 1793–1794; *see, also*, in the context of taxation not in question at bar, *Lee, supra*, 455 U.S. 252, 102 S.Ct. 1051; *Bob Jones, supra*, 461 U.S. 574, 103 S.Ct. 2017. More recently, in reversing a district court's denial of a preliminary injunction under RFRA, the Ninth Circuit Court of Appeals ruled that when balancing a school district ban on the possession of knives in school against the wearing by students of religiously mandated ceremonial daggers, the school district had a compelling interest in protecting students from fears " 'reasonably related to a real threat'." *Cheema v. Thompson*, 67 F.3d 883, 887 (9th Cir.1995) (Judge Wiggins, dissenting, quoting the majority in *Cheema v. Thompson*, No. 94–16097, 1994 WL 477725 (9th Cir. (Cal.) 1994) (unpublished opinion) at *3)).

Other examples may be more instructive for a context such as bankruptcy, which principally involves preserving value in and equitably distributing property, but not directly matters of public or national security. For instance, the Supreme Court found the state's interests in preventing fraudulent unemployment claims, and in educating high school-aged children, to be less than compelling when weighed against religious free exercise claims. *Sherbert, supra*, 374 U.S. 398, 83 S.Ct. 1790; *Yoder, supra*, 406 U.S. 205, 92 S.Ct. 1526.

Finally, should the government prove a compelling interest in substantially burdening the exercise in question, it must present evidence to verify its method of doing so as the "least restrictive means." RFRA § 3(a), 42 U.S.C. § 2000bb–1 (1988 & Supp. V 1993).

C. In *Smith*, 494 U.S. 872, 110 S.Ct. 1595, an Oregon statute outlawed the ingestion of peyote. Because it had a zero tolerance policy on employees' violation of drug laws, a drug rehabilitation center fired two of its counselors when it learned they took peyote as part of their religious worship. *Id.* at 874, 110 S.Ct. at 1597–1598. Subsequently, Oregon's unemployment authority denied the pair benefits because their employer had dismissed them "for work-related misconduct." *Id.* The parishioners claimed this denied them freedom of worship under the First Amendment to the U.S. Constitution. The Supreme Court disagreed, holding that the Free Exercise Clause does not require the government to provide to a religious worshiper an exemption from an otherwise valid, facially neutral law of general applicability, even if the law prohibits the worshiper's religious practices, unless the religious practice is coupled with some other substantive right of constitutional stature. *Id.* at 882, 110 S.Ct. at 1601–1602.

The decision specifically rejected the claimants' argument that it should apply the *Sherbert* test, which requires the government to justify policies that substantially burden religious practice by showing a compelling interest in doing so. *Id.* at 883, 110 S.Ct. at 1602–1603. In the opinion, the Supreme Court admonished that judges lack the constitutional authority to apply the substantial burden prong of the test because it involves evaluating the centrality of a particular religious belief to an adherent's personal faith.

"[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez*, 490 U.S. at 699, 109 S.Ct. at 2148. Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim (citing cases).

*Id.* at 886, 110 S.Ct. at 1604. This inability leaves courts with no practical choice but to apply the compelling interest test whenever a statute jeopardizes any action even "thought to be religiously commanded." *Id.* at 888, 110 S.Ct. at 1605. Thus, the Supreme Court in *Smith* resolved the substantial burden prong of *Sherbert/Yoder*—as a matter of constitutional law—in favor of the exemption claimants. The opinion then held that the only legitimate inquiry courts could make under the test was whether, in balancing of the constitutionally presumed free exercise rights of the claimants against the interest of the government in substantially burdening those rights, the government's interest was sufficiently compelling to warrant enforcing the challenged statute. *Id.* at 888–889, 110 S.Ct. at 1605–1606.

*Smith* states, however, that this analysis leads to one of two anomalous and impermissible outcomes. If courts continue to enforce the recognized compelling interest test in a demanding and meaningful way in the field of religious exercise, as they do with distinctively just results in the racial bias and free speech contexts, absurd equivalents would ensue. "[F]or example, the same degree of 'compelling state interest' [would be required] to impede the practice of throwing rice at church weddings as to impede the practice of getting married in church." *Id.* at 887, n. 4, 110 S.Ct. at 1605, n. 4. Under such a rule, "if 'compelling interest' really means what it says ... many laws would not meet the test." *Id.* at 888, 110 S.Ct. at 1605. This would require federal judges to regularly grant exceptions to all kinds of legitimate or important (but not compelling) government policies to any claimant who can allege a prima facie case that the policy in question has some allegedly detrimental effect, no matter how seemingly inconsequential, on the claimant's subjective religious practice. *Id.*

On the other hand, *Smith* says, courts could choose to water down the compelling interest test to reach sensible results. *Id.* Yet, this would "subvert its rigor in the other fields where it is applied," and severely damage decades of settled civil rights and free expression case law, vital precedent which has produced the fundamental "constitutional norms" of "equality of treatment and an unrestricted flow of contending speech." *Id.* at 888, 886, 110 S.Ct. at 1605, 1604.

Therefore, in condemning the *Sherbert* test as judicially unmanageable, the Supreme Court held in *Smith* that courts lack the institutional competence to apply the sub-

stantial burden/compelling government interest test without either "courting anarchy" under a rule that would give an exception to any claimant with a remotely colorable claim, with absurd and dangerous results, or worse still, eviscerating an indispensable body of fundamental constitutional law. The *Smith* opinion finally concludes that only the legislature possesses the institutional structures sufficient to properly weigh the competing interests of sectarian worshipers and the secular sovereign, asserting that while the courts offer a venue in which to appropriately balance individual liberty against other interests in most fields, the legislature offers another such venue as well, and in the case of religious liberty, a much better one. *Id.* at 890, 110 S.Ct. at 1606.[4]

### III.

Under 11 U.S.C. § 1325(b) charitable contributions, both secular and sectarian, are not a reasonable living expense for the purposes of confirmation of a Chapter 13 plan, so they therefore do come within the definition of disposable income. *In re Lees, supra,* 14 Mont.B.R. at 184. Under the Tessiers' proposed Plan, although the general, unsecured creditors receive nothing, the Tessiers will continue to give their church $100.00 per month in religious offerings. Consequently, the Tessiers do not commit all of their disposable income to the Plan as required under § 1325(b) when a plan proposes less than 100% payment of all claims, and, absent other statutory provisions to the contrary, the Court may not confirm it. *Id.* at 185.

Nevertheless, the Tessiers, supported by the USA and CFER, argue that Congress overruled *Smith* with the passage of RFRA, and because the holding of *Lees* depended on

*Smith,* the Plan should be confirmed. The Court, therefore, must turn to determining the effect of RFRA on the rule in *Lees.*

RFRA analysis begins with deciding whether denying the Tessiers' Plan as proposed constitutes a substantial burden on their exercise of religion. RFRA § 3(a), 42 U.S.C. § 2000bb–1 (1988 & Supp. V 1993). Neither the text, however, nor the legislative history of RFRA ever explicitly designate an authority to which a court may turn to make this judgment. *See, e.g.,* S.Rep. No. 111, 103d Cong., 1st Sess. 9 (1993); H.R.Rep. No. 88, 103d Cong., 1st Sess. 6–7 (1993), U.S.Code Cong. & Admin.News 1993 at 1892, 1895, 1896, 1898. The substantial burden case law offers little help as well. *See, e.g., Graham, supra,* 822 F.2d at 852.

Say an individual appeals to a federal court for relief and demonstrates a sincere belief that only by engaging in a certain practice, (for example, tithing), can the individual be saved from damnation (however the person might define that term). Upon whom may the court rely as an expert to decide how central this belief is to the individual litigant's religion—priests, clerics, preachers, rabbis, mullahs, lamas? If so, what credentials must a holy person possess to be recognized as an expert in matters of salvation? Would a professorship in theology be sufficient? Is the court to give any weight to the personal and doubtless idiosyncratic interpretation of scripture by the individual layperson/litigant before the bar?[5]

The developing RFRA case law embodies the quandary this issue presents. Courts that have ruled on the question of what comprises a "substantial burden" have followed no theory upon which to explain their decisions. *See, e.g., In re Faulkner,* 165 B.R.

---

4. Indeed, on the specific exemption advanced in *Smith,* both the Oregon Legislature and the U.S. Congress have since enacted specific statutory exemptions that may have born this assertion out. *See,* Or.Rev.Stat. § 475.992 (1993) as amended, 1995 Or.Laws 440 (creating a religious use affirmative defense to criminal laws against use of peyote); The American Indian Religious Freedom Amendments of 1994, Pub.L. 103–344, section 2 (adding a new section 3 to the American Indian Religious Freedom Act.)

5. In a case currently pending in the Eastern District of California, a professor of Sikhism and South Asian Relations from Columbia University,

called as an expert witness, expressed an opinion contrary to the subjective beliefs of the claimants before the bar about whether certain religious daggers the Sikh religion requires its adherents to wear must be real functional knives or symbolic non-edged weapons. *See Cheema v. Thompson,* 67 F.3d 883, 890 (9th Cir.1995) (Judge Wiggins dissenting). Before the District Court can answer this question, it must first *establish* the parameters of orthodox Sikh religious doctrine. This exercise is flatly unconstitutional. *Lee, supra,* 455 U.S. at 257 n. 6, 102 S.Ct. at 1055 n. 6, *Hernandez, supra,* 490 U.S. at 699, 109 S.Ct. at 2148–2149.

644 (Bankr.W.D.Mo.1994); *Fordham University v. Brown*, 856 F.Supp. 684, 700–01 (D.D.C.1994). The pattern reflects both a narrow and an unprincipled view of the standard, and in close cases (usually ones based on individual belief rather than official church doctrine) courts often engage in desultory analysis, rejecting worshipers' arguments without thorough discussion. *See* Ira C. Lupu, *Of Time and the RFRA: A Lawyer's Guide to the Religious Freedom Restoration Act*, 56 Mont.L.Rev. 171.

■ Interpreting *Sherbert*, the Ninth Circuit Court of Appeals implicitly acknowledged the likely impossibility of such an inquiry, settling for simply "accept[ing] ... the most favorable cast" it could put upon the worshipers' position. *Graham, supra*, 822 F.2d at 852 (citing *Lee, supra*, 455 U.S. at 257, 102 S.Ct. at 1055, which denies courts' competence to evaluate "the relative merits of differing religious claims"). By doing so, the court rendered the result of the *Sherbert* substantial burden test certain. *Id.* Similarly, under RFRA, a worshiper's subjective belief that a statute places a substantial burden upon acts regarded as central to the exercise of the worshiper's religious faith serves to satisfy the first two elements of the Act.[6] This is, however, the same conclusion the Supreme Court reached in *Smith. Smith, supra*, 494 U.S. at 887–888, 110 S.Ct. at 1604–1605.

In the case *sub judice*, Sharon Tessier, upon cross-examination, sincerely stated that, notwithstanding the fact that Cabinet Mountain Bible Church's hierarchy will not sanction them if they do not make offerings, the Tessiers' faithful exercise of their religion is "contingent" upon their continuing to make monetary religious contributions. The Court must therefore conclude, despite the Tessiers' individual beliefs' apparent contradiction with their church's official doctrine, not allowing them to tithe in Chapter 13 would substantially burden the Tessiers' exercise of their religion. *Graham, supra*, 822 F.2d at

852; *Smith, supra*, 494 U.S. at 887–888, 110 S.Ct. at 1604–1605.

It is no answer to assert, as the Trustee does, that since debtors may tithe in Chapter 7 after liquidation, denial of the ability to do so in Chapter 13 creates no burden. Although the Supreme Court has held that debt relief is a privilege afforded a debtor and is not a fundamental constitutional right, *United States v. Kras*, 409 U.S. 434, 443–50, 93 S.Ct. 631, 636–640, 34 L.Ed.2d 626 (1973) (holding that the Bankruptcy Court lacks authority to grant in forma pauperis status absent statutory authority), it has rejected a distinction between benefits that are provided as a right or as a government privilege within the context of the free exercise of religion. For example, in *Sherbert*, as the RFRA purports to reinstate, the Court rejected the argument that unemployment benefits are a privilege instead of a right, stating that "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Sherbert, supra*, 374 U.S. at 406, 83 S.Ct. at 1795.

■ Furthermore, the Chapter 7 Trustee may attack religious giving by bringing a fraudulent transfer action against the religious institution that received the contributions pursuant to 11 U.S.C. § 548(a). See, e.g., *Christians v. Crystal Evangelical Free Church (In re Young)*, 148 B.R. 886 (Bankr. D.Minn.1992), *aff'd*, 152 B.R. 939 (D.Minn. 1993). Moreover, if it finds the debtor could fund a Chapter 13 plan sufficiently if funds going to the church were diverted to creditors instead, a court may dismiss the Chapter 7 case for substantial abuse under 11 U.S.C. § 707(b). *In re Lee*, 162 B.R. 31 (Bankr.N.D.Ga.1993). Therefore, conversion to Chapter 7 may provide no refuge for debtors exercising their religion through charitable contributions to their church. *See* Michael M. Duclos, *A Debtor's Right to Tithe in Bankruptcy Under the Religious Freedom Restoration Act*, 11 Bankr.Dev.J. 665 (1995)

---

**6.** One commentator has suggested a criteria "emerges [from the RFRA case law] that religious exercise is substantially burdened if religious institutions or religiously motivated conduct is burdened, penalized, or discouraged." Douglas Laycock, *RFRA, Congress, and the Ratchet*, 56 Mont.L.Rev. 145 (1995); *see also,*

Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 Tex.L.Rev. 209, 222–228 (1994). This measure, however, results in a virtually identical analysis and result to the one propounded in *Graham;* the court must take the worshipers' position as factually presumed.

for a thoroughgoing discussion of the repercussions in Chapter 7.

 The RFRA analysis would then have the Court turn to the compelling government interest test. RFRA § 3(a), 42 U.S.C. § 2000bb–1 (1988 & Supp. V 1993). RFRA and its legislative history does not define what it means by the court-made term "compelling government interest." *See, e.g.,* S.Rep. No. 111, 103d Cong., 1st Sess. 9 (1993); H.R.Rep. No. 88, 103d Cong., 1st Sess. 6–7 (1993). Nevertheless, in applying the term in the Religious Exercise contexts not implicating taxing authority, the Court may not "water down" the definition of compelling government interests as only those of the "highest order." *Lukumi, supra,* 508 U.S. at ——, 113 S.Ct. at 2233. This holding dictates that compelling government interests include only those interests pertaining to survival of the republic or the physical safety of its citizens. *Gillette, supra,* 401 U.S. at 461–462, 91 S.Ct. at 842–843; *Prince v. Massachusetts,* 321 U.S. 158, 165, 64 S.Ct. 438, 441–442, 88 L.Ed. 645 (1944).

While the government clearly has interests in the bankruptcy system (providing the debtor with a fresh start, efficiently administering bankruptcy cases, protecting the interests of creditors, *see, e.g., In re Navarro,* 83 B.R. 348 (Bankr.E.D.Pa.1988)) and while these interests are important, but falling short of direct national security and public safety concerns (preserving the economic viability of debtors and creditors, and the value and utility of property), such interests do not implicate the security of the United States or physical safety of its people. These interests therefore, while rational, and even important, are not sufficiently grave to deserve the "compelling" label when balanced against a parishioner's free exercise of religion. *See, Sherbert, supra,* 374 U.S. at 406, 83 S.Ct. at 1795, (rejecting the claim that government has a compelling interest in preventing fraud in unemployment system when compared to a substantial burden on religious practice).

Since not allowing the Tessiers to tithe in their Chapter 13 Plan imposes upon their exercise of religion a substantial burden in which the Trustee has failed to show the government has a compelling interest, RFRA effectively invalidates this Court's holding in *Lees,* which denies, under § 1325(b), confirmation of a Chapter 13 plan in which debtors propose making monthly charitable contributions, at least as far as *Lees* applies to religiously motivated charitable contributions. The first three RFRA issues being thus resolved in favor of the Tessiers, the Court need not inquire whether the government's interest is furthered by the least restrictive means. RFRA § 3(a), 42 U.S.C. § 2000bb–1 (1988 & Supp. V 1993).

 Notwithstanding, the Trustee has opposed the application of RFRA on constitutional grounds, and to this question the Court must bring its attention. First, passage of RFRA may have been a creative response to the Supreme Court's declarations in *Smith,* but it does not "overrule" the Supreme Court's interpretation of the Constitution. Rather, in a purely federal context such as bankruptcy, it attempts to statutorily impose upon the interpretation of federal statutes a formerly constitutional standard. While this may seem a distinction without a difference, it is important to recognize that while RFRA may bear on all federal statutes, it does not and cannot amend the meaning of the First Amendment. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the [constitutional] law is."); *see, also, Cooper v. Aaron,* 358 U.S. 1, 18, 78 S.Ct. 1401, 1409–1410, 3 L.Ed.2d 5 (1958) (holding that an oath to support the Constitution is an oath to support its interpretation by the Supreme Court).

Second, the Congress has express constitutional power to amend its own laws. Art. 1, § 1, U.S. Const. This was obviously true before enactment of the Fourteenth Amendment, and remains true today. Thus, this Court agrees with the unremarkable position, raised in the USA's and CFER's arguments on application of Section 5 of Fourteenth Amendment (apparently to prop up a red-herring) that Congress has the authority to change federal statutory law in general, and to respond to *Smith* by implementing remedial amendments to any of its statutes in

particular. Nevertheless, the Section 5 argument simply misses the point.

Congress has the power to act through RFRA and remedy the institutional barriers courts face in applying the substantial burden/compelling government interest test originating in *Sherbert,* followed in *Yoder,* and abandoned in *Smith.* RFRA, however, fails to even address, let alone cure, the question of the judiciary's competence to balance the interests implicated by the test—the very issue upon which the *Smith* decision turned. *See* Part **II.C.** of this Order, *supra.* In other words, the *Smith* Court did not hold that it lacked constitutional authority to apply the *Sherbert/Yoder* test so much as it held that it lacked the institutional capacity to do so. *Smith, supra,* 494 U.S. at 883–890, 110 S.Ct. at 1602–1606. By merely restating the *Sherbert/Yoder* standard, Congress has provided no mechanism by which courts may apply the substantial burden/compelling government interest analysis consistent with the holding of *Smith.* Unlike a specific statutory amendment designed to accomplish a free exercise end (such as a provision in the Bankruptcy Code specifically excluding reasonable charitable contributions from the definition of disposable income), through RFRA, Congress purports to force the Judicial Branch to apply a statutory standard that it has specifically rejected as judicially unworkable in the constitutional context. *Id.; see also,* Brant, *supra,* 56 Mont.L.Rev. 5. To do so without tailoring the statute to address the Supreme Court's specific reasoning for its rejection of the standard can only doom the Act to constitutional infirmity.

In the case at bar, this Court has concluded under the holding of *Smith* that it lacks the constitutional authority to seriously inquire whether the Tessiers' religious practice requires them to give to their church, and must therefore accept their allegations as true even if their church disagrees. Further, under *Smith,* the Court has had to accept as true the Tessiers' allegation that denying them the ability to make religious offerings in a Chapter 13 Plan substantially burdens their religious practice. Moreover, on the compelling interest side of the analysis, the Court has weighed the Tessiers' religious

exercise interests against the government's important interests in the Bankruptcy Code, and found the latter insufficiently compelling to warrant application of the holding in *Lees.*

As discussed in Part **II.C.** of this Order, however, the central holding of *Smith* denies a federal court's expertise to make such an inquiry. To apply RFRA, the Bankruptcy Court has to fly directly in the face of the Supreme Court's admonition that it cannot adequately evaluate and compare the competing interests implicated by the facts *sub judice. See Smith, supra,* 494 U.S. at 883–890, 110 S.Ct. at 1602–1606. Had the Congress not merely sought to reinstate the same indefinite language of the *Sherbert/Yoder* test; had it instead furnished RFRA with definitions for a "substantial burden" on religious exercise, what constitutes a "compelling government interest" in the free exercise context, and most important perhaps, direction as to how courts should weigh the competing interests; the Act may not have offended *Smith.* Nevertheless, this Congress did not do, and therefore RFRA cannot stand.

Finally, in attempting to deny the Supreme Court's determination of its own capacity to adjudicate, the Congress invades a province properly left to a coordinate Branch, and in so doing, impermissibly exceeds its legislative authority. *Baker v. Carr,* 369 U.S. 186, 215, 82 S.Ct. 691, 709, 7 L.Ed.2d 663 (1962) (a matter is nonjusticiable when there is "a lack of judicially discoverable and manageable standards for resolving it"); *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). In *Chadha,* the Supreme Court ruled that, although when the Congress acts it enjoys the presumption that it has done so within its delegated constitutional powers, whether actions taken by it are legislative in nature depends upon their effect. *Id.* at 951–952, 103 S.Ct. at 2784–2785. RFRA effectively denies the Judiciary's authority to define the limits of its own institutional competence, a judicial decision the Supreme Court has clearly determined only courts can make. *Baker, supra,* 369 U.S. at 215, 82 S.Ct. at 709. The Judicial Branch set its institutional limits regarding free exercise in *Smith,* and invited Congress

to address the judiciary's bounds with instructional legislation. *Smith, supra,* 494 U.S. at 890, 110 S.Ct. at 1606. Rather than take this political responsibility, the Congress impermissibly ordered the courts to ignore *Smith* and apply a judicially unmanageable test. *Baker, supra,* 369 U.S. at 214–215, 82 S.Ct. at 708–709. The doctrine of separation of powers precludes such a result. In the words of the *Chadha* opinion:

> The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted.

*Id.* at 951, 103 S.Ct. at 2784.

### IV.

The Court concludes that RFRA impermissibly violates the central holding of *Smith* by legislating a judicial test which *Smith* specifically rejected. Thus, due to the insolvable dilemma presented in the substantial burden/compelling government interest inquiry, the Court cannot competently apply the *Sherbert/Yoder*/RFRA test. Further, RFRA violates the separation of powers doctrine by setting for the courts a balancing test the Supreme court has designated judicially unworkable. The task of defining tests to adjudicate First Amendment rights falls properly with the Judicial Branch.

As an unconstitutional statute, RFRA has no effect on § 1325(b) of the Bankruptcy Code, the holding of *Lees* thus stands and the Tessiers' charitable contributions should be included in their disposable income for purposes of confirming their Chapter 13 Plan. Since the Tessiers do not commit all of their disposable income to the Plan, the Court cannot confirm it.

IT IS ORDERED the Chapter 13 Trustee's objection to confirmation is sustained; confirmation of the Tessiers' Amended Chapter 13 Plan, filed June 30, 1995 is denied; the Tessiers are granted ten (10) days from the entry of this Order to file an amended Plan in accordance therewith, and if the Tessiers fail to file an amended Plan, the Court may enter an Order dismissing the case without further notice or hearing.