In re Sean M. **HODGE** and Debra A. **Hodge,** husband and wife, Debtors.

**L.D. FITZGERALD, Trustee, Plaintiff,**

v.

**MAGIC VALLEY EVANGELICAL FREE CHURCH, INC., an Idaho corporation, Defendant.**

Bankruptcy No. 95–01294.
Adv. No. 95–6204.

United States Bankruptcy Court, D. Idaho.

Sept. 26, 1996.

Daniel Green, Racine Olson Nye Cooper & Budge, Pocatello, Idaho, for Plaintiff.

Benjamin W. Bull, The American Center for Law and Justice, Phoenix, Arizona, and Emil F. Pike, Jr., Twin Falls, Idaho, for Defendant.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Chief Judge.

*Introduction.*

This adversary proceeding raises difficult and important issues of statutory and Constitutional law. It was commenced by L.D. Fitzgerald ("Plaintiff"), the Chapter 7 Trustee of the bankruptcy estate of Debtors Sean and Debra Hodge, to avoid what he alleges

were fraudulent transfers made by Debtors to Magic Valley Evangelical Free Church, Inc. ("Defendant"). The matter is before the Court on Plaintiff's Motion for Summary Judgment, and Defendant's Motion to Dismiss or for Summary Judgment. These motions were argued to the Court on March 27, 1996.

*Undisputed Material Facts.*

From the record, the following undisputed material facts appear. Defendant was founded in 1983 and is a non-profit religious corporation.[1] Debtors have been members of the Defendant-church since 1986, and have regularly and consistently made periodic cash payments from their limited income to Defendant, referred to as "tithing", since 1988.[2] Plaintiff does not dispute that the practice of tithing is central to Debtors' particular religious beliefs, nor that tithing is a central religious doctrine of Defendant.[3] Further, Plaintiff does not dispute that Debtors are sincere in their religious faith.

Although Debtors and Defendant regard tithing as a biblical obligation, and while it is encouraged by Defendant, tithing is not a condition of membership in the church.[4] Defendant uses tithes to provide a variety of services and benefits to its members and others, spiritual and otherwise.[5] Debtors have personally benefited from some of these services.[6] Individual members, however, may receive these services regardless of whether or how much they tithe.[7]

On May 5, 1995, Debtors filed a joint Chapter 7 bankruptcy petition. During the four years preceding the filing of their Chapter 7 petition, Debtors had paid over a total of $7,259.00 in tithes to Defendant as follows:

| Dates | Tithes |
|---|---|
| May 5, 1991 to May 5, 1992 | $ 286.00 |
| May 6, 1992 to May 5, 1993 | 1,637.00 |
| May 6, 1993 to May 5, 1994 | 2,415.00 |
| May 6, 1994 to May 5, 1995 | 2,789.00 |
| Total: | $7,259.00[8] |

It is a portion of these payments Plaintiff seeks to recover from Defendant.

*Arguments of the Parties.*

Plaintiff filed this adversary proceeding on October 27, 1995, in order to avoid and recover Debtors' contributions to Defendant as fraudulent conveyances within the meaning of 11 U.S.C. § 548(a)(2) and, through 11 U.S.C. § 544(b), Idaho Code §§ 55–913 and 55–914. In simple terms, Plaintiff contends Debtors' tithes to Defendant were made while they were insolvent, and that Debtors received less than reasonably equivalent value in exchange for their contributions. Therefore, Plaintiff argues, the payments should be recovered and distributed to Debtors' creditors in the bankruptcy proceedings.

Defendant argues that the transfers do not satisfy the requirements of the avoidance statutes. Alternatively, if the Court concludes that the transfers are avoidable, Defendant asserts that the state and federal avoidance statutes as applied here run afoul of the protections provided by the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb *et seq.* ("RFRA"), and the Free Exercise Clause and the Establishment Clause of the First Amendment of the U.S. Constitution, and therefore are unenforceable against Defendant. Plaintiff contends that application of the avoidance provisions do not violate either the First Amendment or RFRA. If RFRA does apply here, Plaintiff argues that RFRA is unconstitutional.

1. Affidavit of Rev. Randall Davis at ¶ 1, filed February 2, 1996.

2. Affidavit of Rev. Randall Davis at ¶ 13; Affidavit of Debra Hodge at ¶ 1, filed February 2, 1996; Affidavit of Sean Hodge at ¶¶ 1, 2, filed February 2, 1996.

3. Affidavit of Rev. Randall Davis at ¶ 13; Affidavit of Sean Hodge at ¶¶ 3, 4.

4. Deposition of Rev. Randall Davis at pg. 20, ln. 8–25, pg. 21, ln. 1–23, and pg. 31, ln. 5–11, attached as Exhibit 1 to Supplemental Affidavit of Daniel Green, filed March 26, 1996.

5. Affidavit of Rev. Randall Davis at ¶ 11.

6. Affidavit of Rev. Randall Davis at ¶ 15; Affidavit of Sean Hodge at ¶ 11.

7. Deposition of Rev. Randall Davis at pg. 31, ln. 5–11.

8. Affidavit of Rev. Randall Davis at ¶ 13 and Exhibit B attached thereto.

Both sides seek entry of a summary judgment.

*Status of Proceedings.*

Because the constitutional validity of certain state and federal statutes are at issue in this action, the Court invited the United States and the State of Idaho to intervene and be heard pursuant to 28 U.S.C. § 2403(a) and F.R.C.P. 24(c), as incorporated by F.R.B.P. 7024. On May 20, 1996, the Attorney General for the State of Idaho filed its brief in this action, and on June 14, 1996, the United States Attorney for the District of Idaho filed a brief. The governmental entities support the constitutionality of Idaho Code §§ 55–913 and 55–914, and 11 U.S.C. § 548(a)(2) and RFRA, respectively. At the conclusion of the briefing, the Court took the issues raised by the pending motions under advisement.

*Overview.*

Obviously, several important issues have been raised in this litigation. Initially, the Court must determine whether Debtors' tithes are avoidable transfers as defined by the Bankruptcy Code and the Idaho Code. If the Court concludes that the contributions may be avoided by Plaintiff, the Court must then decide whether application of the avoidance laws in this instance violates the protections against governmental interference in religious practices embodied by Congress in RFRA. Plaintiff, however, contends that RFRA is unconstitutional. Accordingly, if RFRA would otherwise constitute a defense to avoidance, the Court must also determine whether RFRA is constitutionally infirm.

If RFRA is constitutionally sound, Defendant prevails and is entitled to summary judgment, and analysis of Defendant's First Amendment arguments is unnecessary. However, if RFRA is unconstitutional, then, and only then, must the Court address whether the application of Bankruptcy Code Section 548, and Idaho Code §§ 55–913 and

55–914, is prohibited under the First Amendment.

*Standard of Review.*

Summary judgment is appropriate only if, viewing the evidence in light most favorably to the non-moving party, no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. F.R.B.P. 7056; F.R.C.P. 56(c); *State Farm Mutual Auto. Ins. Co. v. Davis*, 7 F.3d 180, 182 (9th Cir.1993). The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of any genuine issue of material fact and that would allow judgment as a matter of law. *Hopkins v. Andaya*, 958 F.2d 881, 884 (9th Cir.1992). Once the moving party has met this burden, the non-moving party may not simply rest upon the allegations or denials of the party's pleadings; rather, the non-movant must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Id.* at 884–85.

■ While Defendant moves to dismiss the action for failure to state a claim, and only alternatively seeks entry of a summary judgment, since Defendant has asked the Court to consider matters outside the pleadings, its motion is properly treated as one for summary judgment. *See* F.R.C.P. 12(b), as incorporated by F.R.B.P. 7012(b).

*Discussion.*

A. *Avoidable Transfers under the Bankruptcy Code and Idaho Code.*

Section 548(a) of the Bankruptcy Code ("Code") provides a bankruptcy trustee with a federal statutory power to avoid and recover fraudulent transfers.[9] Section 544(b) of the Code allows the trustee to avoid any transfers of a debtor's property which would be avoidable under state law. Plaintiff invokes both of these powers in this action.

---

9. Defendant objects repeatedly and strenuously to the "fraudulent" label placed on the transfers that Plaintiff seeks to recover. Defendant correctly observes that no fraudulent intent by Debtors in making contributions to their church has been shown. No such allegation has been made by Plaintiff, nor is any required under the statutes for avoidance. The Court uses the term

"fraudulent conveyance" in describing the transfers here because such is the terminology employed by the applicable statutes. While the statutes provide an additional basis for avoidance of transfers made by a debtor with the actual intent to defraud its creditors, *see* 11 U.S.C. § 548(a)(1), and Idaho Code §§ 55–913(1)(a), here Debtors' intent is not relevant.

Section 548(a) applies only to those transfers made by a debtor within one year of the filing of a bankruptcy petition. Section 548(a)(2) of the Code provides in pertinent part that:

(a) The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before date of the filing of the petition, if the debtor ...

....

(2)(A) received less than a reasonably equivalent value in exchange for such transfer ... and

(B)(i) was insolvent on the date that such transfer was made....

11 U.S.C. § 548(a)(2).

Plaintiff invokes Section 544(b)[10] of the Bankruptcy Code to reach Debtors' conveyances to Defendant made within four years of Debtors' bankruptcy, a right granted to creditors by applicable state law. *See* Idaho Code § 55–918(2). Specifically, Plaintiff seeks to apply Idaho Code §§ 55–913, 55–914, the state law analog of Section 548(a)(2). Idaho Code § 55–913, as to both present and future creditors, provides in pertinent part that:

(1) A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ... if the debtor made the transfer ...:

....

(b) Without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor:

....

2. intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

**10.** Section 544(b) provides in full:

(b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b).

Idaho Code § 55–913(1)(b)(2). With respect to present creditors, Idaho Code § 55–914 provides in relevant part that:

■ A transfer made ... by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made ... if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer ... and the debtor was insolvent at that time....

Idaho Code § 55–914(1).

■ Idaho's avoidable transfer statutes are similar in form and substance to the Code's provision. Both allow a transfer made within the time prescribed to be avoided when the debtor did not receive a reasonably equivalent value in exchange for the transfer and while the debtor was insolvent. *See BFP v. Imperial Savings & Loan Association,* 974 F.2d 1144, 1147 (9th Cir.1992), *aff'd,* 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). Therefore, the Court analyzes the state statutes and the Code provision under the same legal standards.[11]

■ For the Court to find that an avoidable transfer has occurred, Plaintiff must establish that: (1) the debtor had an interest in property; (2) a transfer of that interest occurred within the period prescribed; (3) the debtor received less than reasonably equivalent value in exchange for such transfer, and; (4) the debtor was insolvent at the time of the transfer. *BFP,* 974 F.2d at 1147. In this case, the parties do not dispute, and the Court finds and concludes, that the payments made by Debtors to Defendant were property of Debtors. In addition, the parties do not disagree as to the various dates of Debtors' payments under review, and therefore, the transfer periods under Section 548(a)(2), and Idaho Code §§ 55–913 and 55–914, respectively, are not in question. Rath-

**11.** In *In re United Energy Corp.,* 944 F.2d 589, 594 (9th Cir.1991), the Ninth Circuit Court of Appeals held that because California's statute is similar in form and substance to the Code's avoidable transfer provisions, they may be interpreted contemporaneously. The Idaho Uniform Fraudulent Transfer Act is identical to California's statute. Therefore, this Court will construe Idaho's statutes and the Code provision together as well.

er, only the third and fourth elements of avoidance are at issue.

With regard to the third element, Plaintiff contends that Debtors did not receive reasonably equivalent value in exchange for their tithes. In support of their positions, Plaintiff and Defendant rely upon the affidavits of Debtors Sean and Debra Hodge, and the affidavit and deposition of Rev. Randall Davis. These affidavits outline the various services provided to Debtors and other members of the church, both of a spiritual and secular nature.

■ In this case, however, the Court need not decide whether those services spotlighted by Defendant have a value equivalent to the amount of Debtors' tithes. Even assuming that the services provided by Defendant did constitute "reasonable equivalent value," the Court concludes that the services were not provided "in exchange for" Debtors' contributions. *See* 11 U.S.C. § 548(a)(2)(A); Idaho Code §§ 55–913(1)(b), 55–914(1). The record is clear that tithing in general, and Debtors' contributions in particular, were purely voluntary and in no way linked to the availability of Defendant's services. Defendant's services are made available to its members regardless of whether those members have made contributions to the church, or the extent of any such contributions. While Defendant's policy is laudable, on such basis the Court concludes that there was no *quid pro quo,* that is, no exchange of services for contributions. Plaintiff, as a matter of undisputed fact, has therefore satisfied this element of the avoidance statutes.

■ Insolvency under the various fraudulent transfer statutes is defined differently. For purposes of Section 548(a), a debtor is insolvent at the time of a transfer if the sum of its debts is greater than its assets, excluding exempt assets, at fair valuation. 11 U.S.C. § 101(32)(A). Under the state law definition, a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at fair valuation. Idaho Code § 55–911. Unlike the federal provision, there is no exclusion of exempt assets.

■ For purposes of avoidance under Section 548(a)(2) the Court employs the federal definition for the one year period prior to the petition date. 11 U.S.C. § 548(a)(2). In support of its position that Debtors were insolvent during this period, Plaintiff offers Debtors' bankruptcy schedules. From those schedules, certified by Debtors in the bankruptcy case as correct, Debtors list approximately $4,605.00 worth of assets, and debts totaling about $20,831.00. Debtors claim $3,905.00 in assets as exempt. Moreover, based upon the dates the various debts were incurred, and the lack of significant transfers of any assets, the schedules would show that Debtors' financial condition was substantially similar for the one year preceding the filing of their bankruptcy case. Defendant has provided the Court no credible evidence to dispute these observations. Therefore, the Court concludes that in the one year prior to the filing of the petition, Debtors were insolvent as defined by 11 U.S.C. § 101(32)(A). Accordingly, any contributions by Debtors occurring during this period of insolvency are avoidable by Plaintiff under Section 548(a)(2).

■ For purposes of Idaho Code §§ 55–913 and 55–914, the Court focuses upon the four year period preceding the petition date, and utilizes the state law definition of insolvency, a more difficult standard for Plaintiff to satisfy. At the hearing on the pending motions, Plaintiff conceded that he could demonstrate Debtors' insolvency as defined by Idaho Code § 55–911, only for the two years preceding the petition date, rather than for the four years originally claimed. The Court concurs. Once again based on the relevant bankruptcy schedules concerning assets, debts and transfers of property, and absent any contrary showing by Defendant, the Court concludes that the amount of Debtors' debts exceeded the fair value of all of their assets during the two year period prior to filing for bankruptcy. *See* Idaho Code §§ 55–911, 55–913 and 55–914. Therefore, the contributions occurring during this period of insolvency are avoidable by Plaintiff under Idaho Code § 55–914.

In summary, then, Plaintiff has met its burden showing, from the undisputed material facts, that he is entitled to avoid $5,204.00 in contributions from Debtors to Defendant unless a defense exists.

## B. *Standing.*

■ Defendant asserts that Plaintiff's attempts to recover the subject tithes violates Debtors' constitutional rights to freedom of religion. Debtors, however, are not named parties in this adversary proceeding. While Plaintiff did not directly attack Defendant's standing to raise a constitutional challenge in this case, standing is a jurisdictional prerequisite, and the Court can and should properly examine that issue *sua sponte. FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990); *Ripplinger v. Collins,* 868 F.2d 1043, 1046–47 (9th Cir.1989).

■ In general, parties may assert only their own legal rights. In exceptional cases, though, a party may assert the rights of a third party. In particular, the case law establishes that Defendant should be allowed to assert Debtors' rights under the doctrine of third-party standing if: (1) Defendant has a concrete interest in the outcome of the dispute; (2) Defendant has a close relationship with the party whose rights it is asserting, and; (3) there is some hindrance to the party's ability to protect its own interests. *Voigt v. Savell,* 70 F.3d 1552, 1564 (9th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996). *See also In re Young,* 82 F.3d 1407, 1416 (8th Cir.1996); *In re Newman,* 183 B.R. 239, 248–49 (Bankr. D.Kan.1995).

■ Applying the above factors to this action, the Court concludes that Defendant may assert Debtors' constitutional rights in opposition to Plaintiff's claims. Here, Defendant has a demonstrable, pecuniary stake in the outcome of this controversy. If Plaintiff prevails, Plaintiff would receive and could enforce a money judgment against Defendant for the amount of the avoided transfers. 11 U.S.C. § 550(a).

In addition, the interests of Debtors in this controversy, as tithing members of Defendant who have pledged to financially support Defendant, are sufficiently aligned with Defendant so that Defendant may effectively represent Debtors' religious free exercise rights. Furthermore, Debtors can not effectively protect those rights. Debtors are not parties in this adversary proceeding. There is no other readily available forum to which Debtors may turn. And, practically speaking, Debtors lack the financial resources to actively litigate Plaintiff's claims. Defendant would therefore appear to be the most appropriate party to voice Debtors' concerns under these circumstances.

Accordingly, the Court concludes that Defendant should be allowed third party standing to assert Debtors' constitutional rights in this action.

## C. *Application of RFRA to Plaintiff's Claims.*

Defendant argues that the recently enacted Religious Freedom Restoration Act bars Plaintiff from recovering the transfers made by Debtors. 42 U.S.C. § 2000bb *et seq.* A brief historical perspective is helpful at this point.

Until 1990, the constitutional law as declared by the Supreme Court instructed that the First Amendment Free Exercise Clause prohibited the enforcement of government statutes and regulations which effected a substantial burden on an individual's exercise of religious beliefs except when justified by a compelling interest and achieved through the least restrictive means. *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In a marked divergence from this approach, in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Court held that facially neutral laws would no longer be subject to this level of strict scrutiny under the First Amendment.

Three years later, expressly reacting to *Smith,* Congress enacted the Religious Freedom Restoration Act of 1993.[12] This statute restored the "substantial burden," "compelling interest" and "least restrictive means" tests by mandating that the government shall not "substantially burden" a person's exer-

---

12. The full text of RFRA, 42 U.S.C. § 2000bb, is set out in the Appendix to this Memorandum of Decision.

cise of religion unless the government demonstrates that the burden furthers a "compelling governmental interest" by the "least restrictive means." 42 U.S.C. § 2000bb–1.

While not adopted until 1993, RFRA provides that it is to be applied to all federal and state laws regardless of whether they existed before or after RFRA. 42 U.S.C. § 2000bb–3(a). The Court, therefore, must apply RFRA in this case.[13]

1. Substantial Burden.

▮ The threshold inquiry under RFRA is whether the statute in question substantially burdens a person's religious practices. If there is no substantial burden, RFRA does not apply. Because RFRA restored the test used to consider free exercise challenges before *Smith*, the courts rely on pre-*Smith* decisions under the Free Exercise Clause in determining whether the application of the relative statutes at issue in this case is consistent with RFRA. *See, e.g., Goehring v. Brophy*, 94 F.3d 1294, 1299 (9th Cir.1996).

▮ In order to establish a substantial burden on a religious practice, a claimant must do more than merely show that the government's action in some way has affected his religious practices.

> The religious adherent ... has the obligation to prove that a governmental [action] burdens the adherent's practice of his or her religion ... by preventing him or her from engaging in conduct ... which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.

*Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) (quoting *Graham v. C.I.R.*, 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom., Hernandez v. C.I.R.*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1988)). Put differently, a substantial burden upon religion exists when the statute: (1) requires an individual to refrain from doing something required by

his or her religious beliefs, *Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 140–41, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987), or; (2) forces an individual to choose between following the precepts of his or her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of its religion in order to accept benefits, on the other hand, *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). *See also Thomas v. Indiana Employment Security Division*, 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). When the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his or her beliefs, even though the compulsion is indirect, a substantial burden upon religion exists. *Thomas*, 450 U.S. at 719, 101 S.Ct. at 1432.

In this case, Plaintiff seeks to recover the money Debtors tithed to their church. It is undisputed that tithing is a central tenet of Debtors' religion, and that Debtors have sincerely and regularly practiced this belief. The issue is whether the application of the avoidance laws to the tithes substantially burdens Debtors' or other members' practice of their religion, or impermissibly pressures them into choosing between tithing on the one hand, or obtaining bankruptcy relief on the other.

In support of its position, Defendant relies upon the affidavit of Debtor Sean Hodge wherein he states that he and his wife would not have filed for bankruptcy relief had they known that Plaintiff would seek to avoid their religious tithes. Plaintiff provides no evidence or affidavits to contradict these averments. Defendant maintains that application of the avoidance provisions would "discourage" Debtors and other parishioners from pursuing their religious beliefs and accessing bankruptcy relief. In other words, in the

---

**13.** Plaintiff does not challenge the retroactive applicability of RFRA to the fraudulent conveyance statutes in this action, something which has been sustained by several other courts. *See, e.g., Droz v. C.I.R.*, 48 F.3d 1120 (9th Cir.1995), *cert.* denied, —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 656 (1996); *In re Young*, 82 F.3d 1407 (8th Cir.1996); *Flores v. City of Boerne*, 73 F.3d 1352 (5th Cir.1996).

context of this case, Defendant's members who are experiencing financial difficulty must face the reality that if they have tithed within the last four years while insolvent, then their filing of a Chapter 7 bankruptcy petition will result in a claim being asserted against their church by the bankruptcy trustee.

Plaintiff suggests there is a lack of any connection between the avoidance action and Debtors' tithing practices. In particular, he notes that Debtors have tithed, apparently continue to tithe, and will tithe in the future without regard to the filing of their bankruptcy or Plaintiff's prosecution of the avoidance claim. Plaintiff contends that Defendant has shown no burden on Debtors' religious practices. At least one Court has adopted a similar analysis in addressing this issue:

> There is no evidence that § 548(a) prevents the debtors or any church member from tithing. Indeed, the present record certainly does not suggest that § 548 prevented these debtors from tithing. Equally important, the church has no records which might show that other members did not tithe because of § 548 since no one ever checks to see if members actually do tithe. The funds the Trustee seeks to recover have already been tithed to Defendant. The debtors, in all likelihood, continue to tithe to the Defendant. The debtors fulfilled their religious obligation by tithing in the year prior to their bankruptcy filing. The statute, by its own operation, does nothing to prevent the debtors' fulfillment of their personally held religious obligation to tithe and therefore, does not place a 'substantial burden' on the debtors' practice of their religion.

*In re Newman,* 183 B.R. 239, 251 (Bankr. D.Kan.1995).

■■■ The observations of the *Newman* Court are applicable here. Debtors were not disqualified from seeking bankruptcy relief simply because they practiced religious tithing. Debtors tithed and will likely continue to do so regardless of the outcome of this action. It is also likely that other church members will do the same. However, in the opinion of this Court, the fact that Debtors chose bankruptcy relief while having tithed

while insolvent during the previous two years, thereby exposing their church to an avoidance claim, does not determine whether enforcement of the avoidance laws burdens their religious practice.

It is undisputed that Debtors sincerely believe in the biblical obligation to tithe, and that tenet is central to their religion. They have consistently tithed. Plaintiff has presented nothing to contradict the record that Debtors would not have sought bankruptcy protection had they known it would have financially impacted their church. This Court would concur with the decision of the Eighth Circuit on this issue:

> Even though the church encourages but does not compel tithing, the debtors consider tithing to be an important expression of their sincerely held religious beliefs. In other words, tithing is a religiously motivated, but not religiously compelled, practice. Permitting the government to recover these contributions would effectively prevent the debtors from tithing, at least for the year immediately preceding the filing of bankruptcy petitions. We do not think it is relevant that the debtors can continue to tithe or that there are other ways in which debtors can express their religious beliefs that are not effected by the government action. It is sufficient that the governmental action in question meaningfully curtails, albeit retroactively, a religious practice of more than minimal significance in a way that is not merely incidental.

*In re Young,* 82 F.3d 1407, 1418 (8th Cir. 1996). *See also In re Tessier,* 190 B.R. 396, 404 (Bankr.D.Mont.1996). Put another way, financially strapped debtors should not be subjected to the substantial pressure of choosing between either debt relief on the one hand, or generating a law suit against their church for a money judgment on the other. The Court concludes that Debtors here were substantially burdened in being put to that choice, and so the first prong of RFRA is satisfied.

2. Compelling Governmental Interest.

■■■ Having determined that enforcement of the avoidance statutes in this context

constitutes a substantial burden upon Debtors' exercise of their religious rights, the Court now turns to the second phase of the analysis dictated by the statute. The government (here Plaintiff Trustee) must demonstrate that allowing recovery of Debtors' religious contributions furthers a compelling governmental interest and is accomplished by the least restrictive means. 42 U.S.C. § 2000bb–1(b). RFRA does not define what Congress considers to constitute a compelling governmental interest. However, the express intent of the statute is to "restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972)." RFRA, 42 U.S.C. § 2000bb(b).

In *Sherbert,* the Supreme Court declared that only "paramount" interests give occasion for permissible government limitation on the free exercise of religion. *Sherbert,* 374 U.S. at 406, 83 S.Ct. at 1795. Similarly, in *Yoder,* the Court pronounced that only governmental interests of the "highest order" can outweigh legitimate claims to the free exercise of religion. *Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533. In the application of these standards, a compelling government interest has been found to exist in maintaining the tax system, *Hernandez v. C.I.R.,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989); preserving national security, *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); ensuring public safety, *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); providing public education, *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); and, in enforcing participation in the social security system, *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). *See also, Cheema v. Thompson,* 67 F.3d 883 (9th Cir.1995) (applying RFRA and finding a compelling governmental interest in public safety); *Goehring v. Brophy,* 94 F.3d 1294 (9th Cir.1996) (applying RFRA and finding a compelling governmental interest in public health and well-being). By contrast, no compelling governmental interest exists in preventing fraud in the unemployment compensation system. *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

In the present case, the question is whether the federal bankruptcy laws in general, and Section 548(a)(2) and, through Section 544(b), Idaho Code §§ 55–913 and 55–914 in particular, are necessarily enforceable against Defendant to promote a compelling governmental interest. Plaintiff argues that these provisions enable debtors to obtain a financial fresh start while at the same time protecting the economic interests of creditors by maximizing the debtor's bankruptcy estate. Defendant contends that while the interest identified by Plaintiff may be an important interest, it is clearly not a "paramount interest" of the "highest order," and therefore not a "compelling" interest. The cases decided under RFRA in this situation are split.

*In re Newman,* 183 B.R. 239 (Bankr. D.Kan.1995), like the present case, involved an adversary proceeding brought by the Chapter 7 trustee to recover as avoidable transfers under 11 U.S.C. § 548(a)(2) sums that the debtors had contributed to their church. The *Newman* court concluded that Section 548(a)(2), and the Bankruptcy Code as a whole, served a compelling governmental interest. *Id.* at 252. The *Newman* court specifically noted the importance of the policies of allowing debtors a financial reprieve while treating creditors as fairly as possible. *Id.* The *Newman* court focused on the needs for effective administration of the bankruptcy system, as well as the historical importance of recovery of fraudulent transfers to bankruptcy law. *Id. See also In re Navarro,* 83 B.R. 348, 353 (Bankr.E.D.Pa. 1988) (pre-RFRA; administration of bankruptcy system and protection of interests of creditors are compelling governmental interests).

By contrast, the Eighth Circuit Court of Appeals in *In re Young,* 82 F.3d 1407 (8th Cir.1996), and the bankruptcy court in *In re Tessier,* 190 B.R. 396 (Bankr.D.Mont.1995), found no compelling governmental interest in regulating religious contributions in bankruptcy. *Young* also involved an adversary proceeding brought by the Chapter 7 Trust-

ee to recover the debtors' tithes as avoidable transfers under 11 U.S.C. § 548(a)(2). However, unlike *Newman,* the Eighth Circuit concluded that neither Section 548(a)(2) nor the Bankruptcy Code as a whole served a compelling governmental interest. *Id.* at 1420. The *Young* court specifically noted the important policies of allowing debtors to get a fresh start and treating creditors fairly, but concluded that such interests were not of similar importance as the collection of revenue through the federal tax system or the fiscal integrity of the social security system, which have been recognized as compelling interests in the face of a religious exercise claim. *Id.,* citing *Droz v. C.I.R.,* 48 F.3d 1120, 1122–24 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 656 (1996). *See also Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–49, 104 L.Ed.2d 766 (1989); *United States v. Lee,* 455 U.S. 252, 258–59, 102 S.Ct. 1051, 1055–57, 71 L.Ed.2d 127 (1982).

*In re Tessier,* 190 B.R. 396 (Bankr.D.Mont. 1995), unlike *Young, Newman,* and the present case, involved a Chapter 13 trustee's objection to the debtors' debt repayment plan because the plan incorporated the debtors' right to tithe. *Tessier* interprets the compelling governmental interest requirement more narrowly than *Young* and *Newman* to include "only those interests pertaining to survival of the republic or the physical safety of its citizens." *Id.* at 405. The court acknowledged that "the government clearly has interests in ... providing the debtor with a fresh start, efficiently administering bankruptcy cases, [and] protecting the interests of creditors," but concluded that such interests fell "short of direct national security and public safety concerns." *Id. Tessier* concluded that these interests, although "rational, and even important," were "not sufficiently grave to deserve the 'compelling' label when balanced against a parishioner's free exercise of religion." *Id.,* citing *Sherbert,* 374 U.S. at 406, 83 S.Ct. at 1795 (concluding that preventing fraud in unemployment compensation is not a compelling governmental interest).

▉ This Court agrees with *Young* and *Tessier* that the interests advanced by the bankruptcy system are not compelling as that term has been developed under First Amendment and RFRA jurisprudence. Allowing recovery of religious contributions will not, in this Court's opinion, endanger the ability of the bankruptcy laws to provide financially distressed debtors with effective relief and a new chance to succeed economically. Bankruptcy debtors in general, and these Debtors in particular, will receive their Chapter 7 discharge and fresh start unhindered by whether bankruptcy trustees prevail in recovering religious tithes. Moreover, denying recovery of this class of transfers, when no actual fraud is shown, will have little discernable effect on the integrity of the bankruptcy system, or on the amounts received by most creditors through that system.

### 3. Least Restrictive Means.

▉ Even assuming a compelling governmental interest was at stake in this litigation, Congress, through the fraudulent conveyance statute, has not taken the least restrictive means of protecting that interest. An exception to avoidance could easily be provided when transfers can be shown to have occurred in connection with the practice of sincerely held religious beliefs, and without fraudulent intent.

An example of the approach of providing creditor equity through avoidance statutes, but tailoring the reach of such a statute, is found in the bankruptcy preference provisions. 11 U.S.C. § 547(b). There, Congress allows avoidance of most payments to creditors made by debtors on the eve of bankruptcy as a means of ensuring the equitable distribution of the debtors' assets among all deserving claimants. However, while the reach of the preference statute is broad, Congress has also provided a long list of exceptions to preference avoidance when justified by other appropriate considerations. 11 U.S.C. § 547(c). Just as the preference law can provide for avoidance in general, but protect transfers made on account of contemporaneous exchanges for new value, in the ordinary course of business, or for child support, *see* 11 U.S.C. §§ 547(c)(1), (2), (7), so too could Congress except avoidance of reli-

gious contributions not accompanied by fraudulent intent. In other words, there has been no adequate showing made here that the avoidance statutes take the least restrictive approach in relationship to a debtor's right to freely exercise religious beliefs. This inadequacy violates RFRA.

In summary, the Court finds and concludes that application of the state and federal bankruptcy provisions to avoidance of religious contributions under these facts constitutes a substantial burden on Debtors' practice of their sincerely held religious beliefs. In addition, avoidance of the transfers, not accompanied by any actual fraudulent intent, does not serve to promote a compelling governmental interest, nor are the avoidance statutes drawn as the least restrictive means of advancing that interest. Therefore, RFRA would preclude enforcement of the avoidance laws under these circumstances.

### D. Is RFRA Constitutional?

By deciding that Plaintiff's claims under Section 548(a)(2) of the Bankruptcy Code, and Idaho Code §§ 55–913 and 55–914, are precluded by RFRA, the Court must now focus on Plaintiff's contention that RFRA is unconstitutional.

Plaintiff urges that RFRA violates the constitutional mandate requiring separation of the legislative and judicial powers. Plaintiff maintains that RFRA is an attempt to legislatively overrule the Supreme Court's interpretation of the Constitution, and thereby improperly expands the meaning of the First Amendment. Plaintiff insists that Congress lacked the authority to enact RFRA under Section 5 of the Fourteenth Amendment and that RFRA amounts to an unconstitutional extension of congressional power.

Defendant and the United States respond that RFRA is constitutional.[14] Defendant and the United States contend that RFRA does not overrule the *Smith* decision, nor does it alter the scope of the First Amendment's Free Exercise Clause. Rather, these parties suggest that RFRA instead supplements the protection already afforded reli-

gious exercise by the Constitution. In other words, Defendant and the United States assert that RFRA is a statutory right which provides legislative protection for a constitutional right over and above the minimum benefits guaranteed by the Constitution and, as such, is a valid exercise of legislative power.

If RFRA violates the accepted boundaries of the separation of powers doctrine, or if Congress lacked the constitutional authority to enact RFRA, then this Court is obliged to refuse to enforce the statute. If the statute passes constitutional muster then it serves as a defense to Plaintiff's claims against Defendant, and Defendant prevails.

▮ Any analysis of the constitutionality of a statute must begin with the presumption that the statute is valid. *See United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597–98, 9 L.Ed.2d 561 (1963); *United States ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827, 830 (9th Cir.1993). This presumption is strongest when Congress explicitly determines that it had the power to enact the statute. *Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). That is the case here. In recommending passage of RFRA, both the Senate and House Committees on the Judiciary expressly found that the proposed legislation fell squarely within Congress' enforcement powers granted under Section 5 of the Fourteenth Amendment. H.R.Rep. No. 88, 103d Cong., 1st Sess. 9 (1993); S.Rep. No. 111, 103d Cong., 1st Sess. 14 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1903. However, although when Congress acts it enjoys the presumption that it has done so within its delegated constitutional powers, whether actions taken by it are legislative in nature depends upon their effect. *INS v. Chadha*, 462 U.S. 919, 951–52, 103 S.Ct. 2764, 2784–85, 77 L.Ed.2d 317 (1983).

The Court also notes that the issue of whether RFRA violates the separation of powers doctrine by adopting a balancing test

---

**14.** In its briefing to the Court, the State of Idaho does not address, nor comment upon, the challenged constitutionality of RFRA.

that the Supreme Court has held to be judicially unworkable is not before the Court. In this case, Plaintiff has not disputed, and the record contains an adequate showing, that tithing is a central tenet of Debtors' religion, and that Debtors have sincerely and regularly practiced this belief. As a result, the Court is not asked to evaluate the centrality of an individual's religious beliefs in the manner *Smith* determined this Court lacks the competency to do. *See Smith,* 494 U.S. at 883–890, 110 S.Ct. at 1602–1606. Under these facts, the Court need not determine whether RFRA effectively denies the judiciary's authority to define the limits of its own institutional competence as the Court attempted to do in *Smith.*

■ Rather, this Court's focus will be directed to whether RFRA is a prohibited attempt by Congress to legislatively overrule the Supreme Court's interpretation of the Constitution to improperly expand the meaning of the First Amendment. The Supreme Court held in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), that "it is emphatically the province and duty of the judicial branch to say what the law is." The Court reasoned that "those who apply the rule to particular cases, must of necessity expound and interpret that rule." *Id.* If a law adopted by Congress conflicts with the Constitution, then the Constitution, as defined by the Court, must govern. *Id.* at 178.

Plaintiff of course insists that RFRA is a blatant attempt by Congress to overrule *Smith.* Defendant and the United States contend that application of RFRA in this context does not conflict with the Supreme Court's interpretation of the First Amendment. They explain that RFRA is an independent statutory right which enhances the protection already afforded by the First Amendment. For support in this argument, they rely in part upon the following passage from RFRA's legislative history:

Of course, the legislation does not literally overturn the *Smith* decision or conflict with the Court's authority as interpreter of the Constitution, but instead creates a new statutory right which secures the protection of the free exercise clause. [The Religious Freedom Restoration Act: Hearing before the Subcomm. on the Judiciary, 101st Cong., 2d Sess. 51 (1990)]

*See* United States' Memorandum of Law in Support of the Constitutionality of the Religious Freedom Restoration Act, pgs. 7 n. 2, 21 n. 25, filed June 14, 1996.

■ The language utilized by Congress in RFRA itself, though, seems more candid in its purpose than the statute's legislative history. Indeed, RFRA begins with an express recitation of congressional "findings"[15] serving as a basis for the statute, including:

(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

. . . .

(4) in *Employment Division v. Smith,* 494 U.S. 872 [110 S.Ct. 1595, 108 L.Ed.2d 876] (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion. . . .

42 U.S.C. § 2000bb(a). The declared purpose of the act is:

to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 [92 S.Ct. 1526, 32 L.Ed.2d 15] (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened. . . .

42 U.S.C. §§ 2000bb(b). Furthermore, the statute defines "exercise of religion" as "the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb–2(4). While the legislative history suggests a purpose of supplementing the Court's interpretation of the First Amendment in *Smith,* the express terms of the statute forthrightly declare its purpose is to

---

**15.** While Congress apparently conducted extensive hearings in connection with the passage of RFRA, the "findings" set forth in the language of the statute recite few real facts and are instead in the nature of legal conclusions. *See Keeler v. Mayor & City Council of Cumberland,* 928 F.Supp. 591, 603 n. 14 (D.Md.1996).

restore the precise test rejected by the Supreme Court in *Smith* as the rule of decision in cases implicating the First Amendment.

In spite of the legislative history,[16] the assertion that RFRA creates a new statutory right to supplement the protection already afforded by the First Amendment therefore appears disingenuous. *See* United States' Memorandum of Law, at 8. Although the distinction between constitutional and statutory rights arguably has semantic or theoretical appeal, in the context of RFRA, the statutory right created by Congress is not in accord with Supreme Court precedent.

In reality, Congress, through RFRA, attempts to instruct the Federal courts as to how to interpret the Free Exercise Clause (that is, by mandating the compelling interest test), even though the Supreme Court, the arm of our Government expressly charged by the Constitution with its interpretation, has determined that the compelling interest test is inapplicable. It does so by resurrecting a standard of review previously rejected by the Supreme Court in favor of an entire class of constitutional claimants. *See Goehring,* 94 F.3d at 1306 (Fernandez, J., concurring); *Keeler v. Mayor & City Council of Cumberland,* 928 F.Supp. 591, 599–600 (D.Md.1996); *Hamilton v. Schriro,* 74 F.3d 1545, 1566 (8th Cir.1996) (McMillian, J., dissenting).

In operation, the only basis for invoking RFRA is a claim that one's free exercise of religious beliefs is burdened, the identical basis for a claim under the First Amendment. *See Goehring,* 94 F.3d at 1298 (applying RFRA upon an alleged violation of the Free Exercise Clause of the First Amend-

ment). That is, RFRA will only come into play in those situations already addressed by the Constitution itself, and not in circumstances not governed by the Free Exercise Clause. The Supreme Court has dictated the appropriate standard for judicial review in such situations in *Smith.* However, RFRA effectively provides that the courts must decide First Amendment cases under the compelling interest test. Any distinction between applying the compelling interest test as part of the First Amendment and applying it as a matter of statutory law under RFRA is functionally meaningless. In taking such a bold step, Congress seeks not merely to enhance the protections afforded by the First Amendment, but to define them. This approach is prohibited by the Constitution. *See Keeler,* 928 F.Supp. at 599–600; *see also Hamilton,* 74 F.3d at 1566 (McMillian, J., dissenting).

Nor may RFRA be defended as a valid exercise of Congress' enforcement authority under Section 5 of the Fourteenth Amendment.[17] While the legislature has broad powers to prohibit state action not precluded by the terms of the Constitution, such a prohibition must itself be consistent with the remainder of the Constitution. RFRA fails this test.

In creating RFRA, Congress exercised no particular expertise as compared to other legislative enactments valid under its Section 5 powers. As another court has explained:

> The enactment of RFRA can in no sense be said to involve the "specially informed legislative competence" of Congress. The Congressional "findings" set forth in 42

---

**16.** If the language of a statute is clear and unambiguous, the statute's legislative history is ordinarily not germane to a court's interpretation of the statute. *See Norfolk & Western Railway Co. v. American Train Dispatchers' Ass'n,* 499 U.S. 117, 128, 111 S.Ct. 1156, 1163, 113 L.Ed.2d 95 (1991). Canvassing the legislative history is particularly inapposite in the present case. The possibility that Congress might lack the power to pass RFRA was considered by the legislators during the law-making process. Beyond doubt, Congress is aware that courts frequently consider legislative history in resolving challenges to statutes. Under such circumstances, Congress' statement that RFRA does not "conflict with the Court's authority as interpreter of the Constitu-

tion", Hearing before the Subcomm. on the Judiciary, 101st Cong., 2d Sess. 51 (1990), casts no real doubt on Congress' real intention to overturn Supreme Court precedent as found in *Smith* through the passage of RFRA.

**17.** The inquiry into what is appropriate legislation under Section 5 is whether: (1) the statute may be regarded as an enactment to enforce the Fourteenth Amendment; (2) it is plainly adapted to that end, and; (3) it is consistent with the letter and spirit of the Constitution. *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1724, 16 L.Ed.2d 828 (1966).

U.S.C. § 2000bb includes the pronouncements that "governments should not substantially burden religious exercises without compelling justification," 42 U.S.C. § 2000bb(a)(3), and that "the compelling interest test ... is a workable test for striking sensible balances between religious liberty and competing governmental interests," 42 U.S.C. § 2000bb(a)(5).... As Judge McMillian of the Court of Appeals for the Eighth Circuit pointed out in his dissent, "the language of the findings portrays Congress, not as a political organ well-suited to conduct the business of empirical research and policy implementation, but as a super-Supreme Court." *Hamilton v. Schriro,* 74 F.3d 1545, 1566 (8th Cir.1996) (dissenting opinion) (footnote omitted).

*Keeler,* 928 F.Supp. at 603 (footnotes omitted). Section 5 of the Fourteenth Amendment does not empower Congress to require "the federal courts to exercise 'the judicial Power of the United States,' U.S. Const., Art. III, § 1, in a manner repugnant to the text, structure and traditions of Article III." *Plaut v. Spendthrift Farm, Inc.,* —— U.S. ——, ——, 115 S.Ct. 1447, 1452, 131 L.Ed.2d 328 (1995).

Without doubt, there is a significant collection of cases deciding that RFRA is constitutional. *See, e.g., Sasnett v. Sullivan,* 91 F.3d 1018 (7th Cir.1996); *Flores v. City of Boerne,* 73 F.3d 1352 (5th Cir.1996); *E.E.O.C. v. Catholic Univ. of Am.,* 83 F.3d 455 (D.C.Cir. 1996); *Belgard v. Hawai'i,* 883 F.Supp. 510 (D.Haw.1995). The debate concerning this issue will undoubtedly be settled, if at all, in the highest courts of the land, not in its bankruptcy courts. However, for this Court's purposes, and under the facts of this case, the Court is compelled to hold that RFRA is unconstitutional, and therefore, the statute cannot serve as a defense for Plaintiff's claims against Defendant.

*First Amendment Claims.*

By deciding that RFRA is unconstitutional, the Court must now focus on Defendant's contentions that application of the avoidance provisions here violates the Free Exercise Clause and Establishment Clause of the First Amendment to the Constitution.

### A. *Free Exercise Clause.*

 The Free Exercise Clause of the First Amendment provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. amend. I. Stated simply, this provision forbids the government from adopting laws designed to suppress individual religious beliefs or practices. *E.g., Board of Ed. of Westside Community Schools v. Mergens,* 496 U.S. 226, 248, 110 S.Ct. 2356, 2370–71, 110 L.Ed.2d 191 (1990); *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 389, 105 S.Ct. 3216, 3225–26, 87 L.Ed.2d 267 (1985). In the context of this action, Defendant contends that if the Bankruptcy Code allows Plaintiff to recover tithes, its members' practice of their religious beliefs is threatened.

Because the Court has concluded that RFRA is an unconstitutional statute, the free exercise analysis set forth by Congress in RFRA does not apply. Rather, the constitutional standard developed by the Supreme Court is applicable in weighing Defendant's arguments. A balancing test was traditionally utilized to analyze free exercise complaints, as articulated in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Under this test, governmental actions that substantially burden a religious practice must be justified by a compelling interest and must be narrowly tailored to achieve that interest. *Id.* at 403, 83 S.Ct. at 1793. However, as discussed above, a more recent decision by the Supreme Court dramatically altered the manner in which courts must evaluate claims under the Free Exercise Clause.

In *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court held that the Free Exercise Clause does not require the government to demonstrate a compelling state interest for a facially neutral law of general applicability which incidentally effects a particular religious practice. *Id.* at 885, 110 S.Ct. at 1603–04. In applying the case law here, the first question to address is whether Defendant's claims should be evaluated using the traditional *Sherbert* balancing test or the

more restrictive test authorized in certain situations by *Smith*.

Defendant argues that although the avoidance provisions of the Bankruptcy and Idaho Codes are facially neutral, they are not generally applicable to all religions due to the fact that the statutes compel some churches to surrender tithes, and others not, based on whether a particular church requires the payment of tithes in exchange for church services. Defendant reasons that because the provisions impact religions in a disparate manner they are not laws of "general applicability." According to Defendant, these laws must therefore be evaluated under the compelling governmental interest test as set forth in *Sherbert*.

Plaintiff asserts that the avoidance provisions are neutral laws of general applicability with only an incidental effect on Debtors' free exercise rights. Therefore, the test articulated in *Smith* applies to the case at bar, and it need not be shown that the statutes serve an important (let alone compelling) purpose, even if their effect burdens the practice of religion. The United States and the State of Idaho's arguments mirror those advanced by Plaintiff.

█ Plaintiff is correct. The Court concludes that this case falls squarely within the rule announced in *Smith* because the statutory provisions in question are neutral and generally applicable laws which only incidentally effect the practice of religion. This is why.

█ Under the cases, "neutrality" and "general applicability" are separate but related requirements. *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993). In *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the Court restated the tests, originally enunciated in *Smith*, for determining whether a statute impermissibly burdens religious practice. The Court noted that

> at a minimum, the protections of the Free Exercise Clause apply if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct

*because it is undertaken for religious reasons. . . .* Although a law targeting religious beliefs as such is never permissible, if the object of the law is to infringe upon or restrict practices merely *because of their religious motivation,* the law is not neutral. . . .

*Id.* at 533, 113 S.Ct. at 2227 (citation omitted; emphasis added). *Cf. Smith*, 494 U.S. at 878–89, 110 S.Ct. at 1599–1600. Under the neutrality analysis, then, the focus is on the object of the challenged statute.

█ When determining whether the object of a statute is neutral, courts begin with its text because the minimum requirement of neutrality is that a law not discriminate on its face. *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 531, 113 S.Ct. at 2226. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or text. *Id.*

█ The neutrality analysis, however, does not end with the language of the statute. Facial neutrality is not determinative. The Free Exercise Clause is also concerned with "subtle departures from neutrality and covert suppression of particular religious beliefs." *Id.* The court, therefore, must also look at the effect of the law in its real application as strong evidence of its object. To be sure, though, an adverse impact will not always lead to a finding of impermissible targeting. *Cf. id.* at 534, 113 S.Ct. at 2228.

█ In this case, the subject statutes make no reference to religions or to religious practice. Similarly, Defendant has offered no proof that the statutes were in any way intended to target religious activity. *Cf. Church of Lukumi Babalu Aye, Inc.*, 508 U.S. at 534, 113 S.Ct. at 2228. The provisions merely allow a bankruptcy trustee to recover certain transfers when specified criteria are satisfied. None of those criteria are related to religious belief or practices, nor is it relevant whether there exists a religious motivation for the transfers.

█ Further, the Court finds that the avoidance statutes have no more than an incidental effect on religion. The purpose of the statutes is to promote the equal treat-

ment of similarly situated creditors of the debtor, and to enlarge the pool of funds available for those creditors by recovering gratuitous transfers made by insolvent debtors. *In re Faulkner,* 165 B.R. 644, 648 (Bankr.W.D.Mo.1994); *In re Young,* 152 B.R. 939, 953 (D.Minn.1993); *In re Minnesota Utility Contracting, Inc.,* 110 B.R. 414, 417 (D.Minn.1990). This is a legitimate concern of government for reasons quite apart from any notion of religious discrimination. The fact that a transfer meeting the criteria of the avoidance statutes was made pursuant to a religious belief or practice is merely incidental to the operation of the statute. There is no evidence that in achieving the purpose behind Idaho Code §§ 55–913 and 55–914, and Section 548(a)(2), the adverse impact upon conduct motivated by religious belief occurs with the intention or calculation to target such conduct.

Moreover, a variety of other laws, both federal and state, which clearly apply to religious organizations and their members have been sustained under the attack that they violate the Free Exercise Clause. *See, e.g., Hernandez v. C.I.R.,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (suit brought to enforce Internal Revenue Code); *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (social security); *South Ridge Baptist Church v. Industrial Comm'n of Ohio,* 911 F.2d 1203 (6th Cir.1990), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 754, 112 L.Ed.2d 774 (1991) (workers' compensation); *Dole v. Shenandoah Baptist Church,* 899 F.2d 1389 (4th Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990) (minimum wage laws); *E.E.O.C. v. Tree of Life Christian Schools,* 751 F.Supp. 700 (S.D.Ohio 1990) (Equal Pay Act). The Court concludes that the Bankruptcy Code and Idaho Fraudulent Conveyance Act are constitutional for the same reasons. *See The 1992 Republican Senate–House Dinner Comm. v. Carolina's Pride Seafood, Inc.,* 858 F.Supp. 243, 247 (D.C.1994); *Faulkner,* 165 B.R. at 648; *In re Lee,* 162 B.R. 31, 42 (Bankr. N.D.Ga.1993); *Young,* 152 B.R. at 953. In sum, then, the neutrality inquiry leads the Court to conclude that the challenged provisions do not have as their object, nor do they in practice effect, a suppression of religion, but instead only incidentally burden religious practice under these circumstances.

■ The Court turns next to the second requirement of the Free Exercise analysis, the rule requiring that any law incidentally effecting religious practice must be of general applicability. *Church of Lukumi Babalu Aye,* 508 U.S. at 542, 113 S.Ct. at 2231–32 (citing *Smith*). It is true, as Defendant asserts, that the Free Exercise Clause does protect religious observers against unequal treatment. *E.g., id.* at 545, 113 S.Ct. at 2233; *Hobbie v. Unemployment Appeals Comm'n of Florida,* 480 U.S. 136, 148, 107 S.Ct. 1046, 1053, 94 L.Ed.2d 190 (1987). However, as taught by the Supreme Court, the inequality prohibited "results when a legislature decides that the governmental interests its seeks to advance are worthy of being pursued *only against conduct with a religious motivation.*" *Church of Lukumi Babalu Aye,* 508 U.S. at 545, 113 S.Ct. at 2233 (emphasis added).

■ Here, the bankruptcy trustee is not authorized to pursue avoidance in a selective manner by imposing burdens *only* upon conduct motivated by religious belief. The avoidance laws apply not just to religious organizations, but more generally to all charitable organizations, and more generally still, to any entity, based solely upon a finding that the entity has received a transfer of property in return for which the insolvent transferor did not receive reasonably equivalent value. Whatever the donor's motivation, property given away by an insolvent debtor on the eve of requesting bankruptcy relief may be recovered and shared by the debtor's creditors. Clearly, the statutes at issue here are not of the type the Constitution stands to prevent: "ordinances [which] have every appearance of a prohibition that society is prepared to impose upon [religious adherents] but not upon itself." *Id.* at 545, 113 S.Ct. at 2233. This Court therefore concludes that the avoidance provisions are laws of general applicability.

In summary, for purposes of the analysis required by *Smith,* the avoidance provisions are generally applicable laws, neutral toward religion on their face, in their object and

operation. In addition, these laws do not have more than an incidental effect on the practice of religion. Defendant's free exercise challenge therefore fails.

### B. *Establishment Clause.*

Defendant argues next that the application of Bankruptcy Code Section 548, and Idaho Code §§ 55–913 and 55–914, violates the Establishment Clause. First, Defendant asserts that the avoidance provisions affect a "denominational preference" because the application of the statutes turns on Defendant's particular religious dogma. In essence, Defendant reasons that the avoidance laws discriminate among religions by compelling some churches to surrender tithes, and others not, based on whether a given church requires the payment of tithes in exchange for church services.[18] Second, Defendant argues that the trustee must review the church's tithing records and religious doctrines to determine whether the avoidance provisions apply. Defendant contends that such action constitutes an impermissible government entanglement with religion, and another Establishment Clause violation.

Plaintiff maintains that the avoidance provisions do not violate the Establishment Clause. Plaintiff points out that the avoidance provisions are denominationally neutral because they do not explicitly or deliberately make distinctions between different religions. In Plaintiff's view, the statutes apply to all entities, religious or otherwise, and any unequal treatment based upon a particular church's dogma is not a basis for prohibiting the statutes' application. In addition, Plaintiff argues that any regulatory and administrative interaction involved in investigating potentially avoidable transfers does not pose an unconstitutional government entanglement with religion. The State of Idaho and the United States take an identical position on this argument.

The Court's analysis on this point begins with the Supreme Court's decision in *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). *Larson* teaches that

> when it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions. If no such facial preference exists, we proceed to apply the customary three-prong Establishment Clause inquiry derived from *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105 [29 L.Ed.2d 745] (1971).

*Hernandez v. C.I.R.,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989).

■■■ Clearly, the statutes at issue create no official preference as argued by Defendant. The line which the laws draw between avoidable and unavoidable transfers does not facially discriminate among sects. *Cf. id.* at 695, 109 S.Ct. at 2147. Indeed, the avoidance laws apply not just to religious organizations, but more generally to all charitable organizations, and more generally still, to any entity at all, based solely upon a determination that an entity has received a transfer of property for which the insolvent transferor-debtor did not receive reasonably equivalent value. As applied to religious groups, the statutes make no explicit and deliberate distinctions between different denominations or followings, and therefore, affect no denominational preference. *Cf. Larson,* 456 U.S. at 246–47 n. 23, 102 S.Ct. at 1684–85 n. 23.

■■■ Finding that no such facial preference exists, the Court instead utilizes the customary three-pronged Establishment Clause inquiry in this case. *Hernandez,* 490 U.S. at 695, 109 S.Ct. at 2146. As announced in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), to

---

**18.** Defendant also argues that under the avoidance statutes at issue in this case, the Court must determine whether Debtors received reasonable equivalent value in exchange for their tithes. *See* 11 U.S.C. § 548(a)(2)(A); Idaho Code §§ 55–913(1)(b), 55–914(1). In doing so, Defendant contends that the Court must determine whether the religious benefits received from the church have tangible "value." Defendant claims that such an analysis violates the Establishment Clause by forcing the trustee and reviewing courts to differentiate religious benefits from secular ones. In this case, however, the Court has concluded above that the services were not provided "in exchange for" Debtors' contributions. As a result, the Court need not inquire into whether the services received by Debtors had a value equivalent to the amount of Debtors' tithes, and the Court need not address Defendant's Establishment Clause theory.

withstand a traditional Establishment Clause challenge, a statute must: (1) have a secular purpose; (2) have a primary effect which neither advances nor inhibits religion, and; (3) it must not foster an excessive entanglement with religion. The challenged practice must survive all three prongs of the analysis in order to be held constitutional. *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).

 The first prong of the Establishment Clause inquiry asks whether the statutes' actual purpose is to endorse or disapprove of religion. *Cf. Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (1984). The Federal bankruptcy and state avoidance provisions at issue in this case exist for reasons unrelated to religious doctrine. Fraudulent conveyance statutes date back to 16th century England, and have been a continuous fixture in this nation's debtor-creditor jurisprudence. The purpose behind Sections 55–913 and 55–914 and Section 548(a)(2) is obvious, and plainly secular: to prohibit insolvent debtors from depleting the assets available to creditors through gratuitous transfers of their property. *In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1181 (11th Cir.1987); *In re Our Distribution Co., Inc.*, 110 B.R. 658, 664 (Bankr. S.D.N.Y.1990); *In re Weisman*, 112 B.R. 138, 140 (Bankr.W.D.Pa.1990). In adopting such laws, legislatures promote equitable treatment of creditors where debtors' assets are inadequate to satisfy all claims against a debtor. Clearly, these are goals neutral in design and purpose. Defendant cannot show these laws were enacted to target or promote religions.

 Under the second prong, the Court should consider whether, objectively, the government action involved may reasonably be construed as sending primarily a message of either endorsement or disapproval of religion. *Cf. County of Allegheny v. ACLU*, 492 U.S. 573, 592–93, 109 S.Ct. 3086, 3100–01, 106 L.Ed.2d 472 (1989). Here again, the primary effect of the statutes at issue-avoidance of constructively fraudulent transfers to entities, including religious organizations, in order to protect the interests of creditors—can not be seen to either advance or inhibit religion. It may be, as argued by Defendant, that one consequence of the "in exchange for" requirement of the avoidance laws is to impose a disparate burden on those religious organizations that provide religious services without regard to whether an individual has tithed. But statutes having a primarily secular effect do not violate the Establishment Clause merely because they happen to coincide or harmonize with the tenets of some religions and adversely impact others. *Cf. Hernandez*, 490 U.S. at 696, 109 S.Ct. at 2147; *Bob Jones University v. United States*, 461 U.S. 574, 604 n. 30, 103 S.Ct. 2017, 2035 n. 30, 76 L.Ed.2d 157 (1983); *McGowan v. Maryland*, 366 U.S. 420, 442, 81 S.Ct. 1101, 1113–14, 6 L.Ed.2d 393 (1961). Just as there is no evidence that the actual purpose of enactment of the avoidance statutes was to impair religious practices, there is similarly no evidence that such was an ulterior motivation for adoption of these laws.

 The final prong of the Establishment Clause inquiry requires the Court to examine whether the government action results in an excessive government entanglement with religion. *Lemon*, 403 U.S. at 613, 91 S.Ct. at 2111. Defendant asserts that the provisions at issue here spawn impermissible government entanglement with religion because bankruptcy trustees must review a church's tithing records and religious doctrine to determine whether the avoidance provisions apply.

In support of its argument that routine regulatory interaction which involves inquiries into religious doctrine is unconstitutional under the Establishment Clause, the Defendant cites, among others, *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), and *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). These decisions, along with the others, are wide of the mark in the present context. The decisions deal with either doctrinal or administrative disputes within a church. In them, the Supreme Court established the principle that the government should not become embroiled in internecine church matters. *Jones*, 443 U.S. at

602, 99 S.Ct. at 3025; *Presbyterian Church,* 393 U.S. at 450, 89 S.Ct. at 607.

Such considerations are far removed from the issues before the Court here. The Court is not called upon to decide or review internal matters of church business, like church property disputes, nor to resolve underlying controversies over religious doctrine as in *Jones* and *Presbyterian Church.*

As a result, the present case is more like *Jimmy Swaggart Ministries v. Board of Equalization of California,* 493 U.S. 378, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990), involving the imposition of administrative and record keeping burdens on a church through the neutral application of a state tax provision on religious institutions, and *Hernandez v. C.I.R.,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989), requiring religious institutions to disclose relevant information about church costs to the IRS to enable church members to secure tax deductions for their contributions. Under these decisions, the Supreme Court made it clear that routine regulatory interaction between government and churches involving no detailed monitoring or close administrative contact between secular and religious bodies does not violate the anti-entanglement command of the Establishment Clause. *Cf. Hernandez,* 490 U.S. at 697, 109 S.Ct. at 2147; *Jimmy Swaggart Ministries,* 493 U.S. at 395–96, 110 S.Ct. at 698–99. *See also Aguilar v. Felton,* 473 U.S. 402, 414, 105 S.Ct. 3232, 3239, 87 L.Ed.2d 290 (1985).

Administrative entanglement of a kind found to violate the Establishment Clause is typically characterized by comprehensive, continuous and systematic government surveillance of religion. *Cf. Lemon,* 403 U.S. at 621–22, 91 S.Ct. at 2115–16; *Lynch,* 465 U.S. at 684, 104 S.Ct. at 1365; *Hernandez,* 490 U.S. at 698, 109 S.Ct. at 2148; *Jimmy Swaggart Ministries,* 493 U.S. at 395–96, 110 S.Ct. at 698–99. Application of the avoidance provisions at issue here will only occasionally require religious institutions to disclose relevant information about doctrine and tithing records to the trustee concerning a member in bankruptcy. This sort of administrative inquiry bears no resemblance to the kind of government surveillance the Supreme Court has previously held to pose an intolerable risk of government entanglement with religion. No intimate relationship between government and religious organizations is contemplated, nor does application of these neutral statutes require continuous and systematic monitoring of religious activities.

Because the Court finds the statutes in question are both facially and objectively nondiscriminatory, and that no excessive entanglement between government and religion is fostered in this case, the Court holds that the imposition of the avoidance provisions on Defendant does not violate the Establishment Clause.

*Conclusion.*

This action highlights the need for a sensitive but workable balance between the operation of the Federal bankruptcy laws and the free practice by Debtors of their religion. While the Constitution protects Debtors, and their church, from government intrusion deliberately aimed at burdening individual religious freedoms, it does not prohibit the application of those bankruptcy provisions which are facially neutral, generally applicable, and which only incidentally impact Debtors' practices. To the extent Congress sought to adjust this delicate Constitutional balance by statute, and to dictate the manner in which our Courts interpret our national charter, it exceeds its legitimate authority. While Debtors' religious rights deserve solemn respect, so too do the rights of Debtors' creditors to payment of their just claims. Incidental, nondiscriminatory interference with their practice of religious tithing in this case is the consideration Debtors should expect in exchange for the debt relief provided by the Federal bankruptcy laws.

Plaintiff has shown, without genuine issue of material fact, that Defendant received payments from Debtors, while Debtors were insolvent, during the relevant recovery periods specified by Section 548 and Idaho Code §§ 55–913 and 55–914, totaling $5,204.00. While they obviously experienced benefits from their church membership, Debtors did not receive reasonably equivalent value in exchange for these payments. As a matter

of law, the payments are therefore avoidable and recoverable by Plaintiff in his status as the Chapter 7 Trustee of Debtors' bankruptcy estate.

Defendant's Motion to Dismiss and Motion for Summary Judgment should be denied. Plaintiff's Motion for Summary Judgment should be granted. A separate order and judgment will be entered.

## APPENDIX

### RELIGIOUS FREEDOM RESTORATION ACT OF 1993

#### 42 U.S.C. §§ 2000bb, et seq.

**§ 2000bb. Congressional findings and declaration of purposes**

**(a) Findings**

(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

(3) governments should not substantially burden religious exercise without compelling justification;

(4) in *Employment Division v. Smith,* 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

**(b) Purposes**

The purposes of this chapter are—

(1) to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

**§ 2000bb–1. Free exercise of religion protected**

**(a) In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

**(b) Exception**

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in the furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

**(c) Judicial relief**

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

**§ 2000bb–2. Definitions.**

As used in this chapter—

(1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, a State or a subdivision of a State;

(2) the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

(3) the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

(4) the term "exercise of religion" means the exercise of religion under the First Amendment of the Constitution.

§ 2000bb–3. Applicability

**(a) In general**

This chapter applies to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

**(b) Rule of construction**

Federal statutory law adopted after November 16, 1993 is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

**(c) Religious belief unaffected**

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

**§ 2000bb–4. Establishment clause unaffected.**

Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause"). Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter. As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.