**In re Benjamin RIVERA and Antoinette Rivera, Debtors.**

**Robert L. GELTZER, as Trustee of the Estate of Benjamin Rivera and Antoinette Rivera, Plaintiff,**

v.

**CROSSROADS TABERNACLE, Defendant.**

Bankruptcy No. 96–B–41833 (PCB).

Adversary No. 96–9179A.

United States Bankruptcy Court, S.D. New York.

Sept. 26, 1997.

As Corrected Oct. 7, 1997.

Tendler, Biggins & Geltzer by Robert Geltzer, New York City, for Chapter 7 Trustee.

Uscher, Quiat & Uscher by Mary E. Naggio, New York City, for Crossroads Tabernacle.

### MEMORANDUM DECISION DENYING DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

PRUDENCE CARTER BEATTY, Bankruptcy Judge.*

This adversary proceeding was commenced by Robert L. Geltzer as Chapter 7 Trustee (the "Trustee") of the estate of Benjamin and Antoinette Rivera (the "Debtors") to recover pre-petition transfers of $5,279.30. These transfers were made to and for the benefit of the Crossroads Tabernacle (the "Church") within twelve months prior to the Debtors filing their Chapter 7 petition. The Trustee alleges that these contributions constitute a fraudulent transfer recoverable pursuant to Bankruptcy Code § 548(a)(2).

---

* Formerly known as Prudence Beatty Abram.

The Church moves to dismiss this adversary proceeding pursuant to Bankruptcy Rule 7012, which incorporates by reference Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), on the grounds that the Trustee has failed to state a claim on which relief can be granted. Alternatively, the Church moved that if the court found that the Trustee had stated a claim, allowance of any recovery of the transfers would violate the Debtors' rights under the Free Exercise Clause and Establishment Clause of the First Amendment of the United States Constitution and their rights under the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb et seq. ("RFRA")[1] The Church also moves for sanctions under Bankruptcy Rule 9011, which incorporates by reference Federal Rule of Civil Procedure 11. The Trustee had filed a cross-motion for sanctions. However, he withdrew this motion at the hearing on this matter.

For the reasons set forth below, the court holds that the Trustee has stated a claim for relief and that any recovery of the transfers would not violate the Debtors' rights under either the Free Exercise Clause or the Establishment Clause. The Church's motion to dismiss the adversary proceeding is therefore denied as is its request for sanctions.

### STATEMENT OF FACTS[2]

*The Debtors*

1. On April 8, 1996 (the "Filing Date"), the Debtors, Benjamin Rivera and Antoinette Rivera filed a joint petition under Chapter 7 of the Bankruptcy Code (the "Code"). Robert L. Geltzer was appointed as the Trustee.

2. The Debtors are married and live with their two children, a 19-year-old daughter and a ten-year-old son. The wife's 57-year-old mother lives with the Debtors as well. Benjamin Rivera is employed as a truck driver. He states his net monthly earnings as $3028.59. Additionally, Antoinette Rivera receives $1,541 per month in disability payments. The monthly family income is therefore $4569.59.

3. The Debtors state that their 1995 gross income was $52,672 and their 1994 gross income was $67,922.

*The Debtors' Assets*

4. The schedules to the petition list the Debtors' assets at $179,897. These assets include the Debtors' residence, located at 2780 Wilson Avenue, Bronx, New York 10469 (the "Bronx Residence"), which the Debtors value at $170,000. The Bronx Residence is encumbered by three mortgages (the "Mortgages") in favor of Citibank, N.A., Bristol Oaks, L.P. and Ontra, Inc. (collectively, the "Mortgagors"). The Bronx Residence is worth less than the Mortgages which encumber it.

5. The Debtors also state they have personal assets totaling $9,897. These assets include $1000 in household goods, $30 in books, $300 in clothing, $200 in jewelry and a computer which they state is worth $200. In addition, the Debtors schedule two automobiles: a 1993 Dodge Caravan, which they value at $4500 and a 1976 Volkswagen Van which they value at $200. Finally, the Debtors state their monetary assets as $517 from a New York State income tax refund, $1400 in checking accounts and $1400 in a savings account.[3]

*The Debtors' Liabilities and Expenses*

6. The schedules to the petition list the Debtors' liabilities at $820,678. However,

---

**1.** On June 25, 1997 the Supreme Court in *City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (6–3 majority), held RFRA to be unconstitutional, stating that Congress exceeded its authority in enacting that statute. Thus, the Church's use of RFRA in support of its position has been rendered moot.

**2.** Much of the Statement of Facts is based on the Debtors' petition, schedules and statement of affairs. The court deems these facts to have been admitted by the Debtors. The purpose of the Statement of Facts is to set the legal dispute in a

factual context so that it can be properly understood since this is a motion to dismiss that has not been converted into a summary judgment motion. *See* Bankruptcy Rule 7012 and Federal Rule of Civil Procedure 12(c).

**3.** The statement of affairs indicates that the Debtors made a petition date transfer of $3,500 to Luis and Miriam Chico and Miriam Alvarez from their savings account. The petition schedules debts of $2,000 to Miriam Chico and Miriam Alvarez based on 1995 loans. Whether this is net of the $3,500 is unclear.

the Debtors appear to have overstated the aggregate of the Mortgages which encumber the Bronx Residence. More specifically, the Debtors have scheduled each of the three Mortgages in the amount of $220,000 and listed an aggregate total owed on the Mortgages of $660,000. The most reasonable explanation is that the three Mortgages aggregate to $220,000. This view is supported by Citibank's motion to lift the stay which stated the principal amount due it as $139,000 and a total indebtedness of $233,000 including interest. *See* Finding 11. If the Debtors did borrow $660,000, the schedules fail to reflect what happened to the money since it appears highly unlikely that any drop in the real estate market could explain a reduction from a purchase price of $660,000 to a value of less than $220,000.

7. The Debtors list one unsecured priority creditor, the New York City Department of Finance, which is owed $2600 for real estate taxes for the 1994–95 tax year.

8. The Debtors' list nine unsecured nonpriority creditors. In addition to $50,000 stated to be the unsecured portion of the Mortgages, there is $1,847.55 in credit card debt; $630.85 in unpaid medical bills; and three personal loans received in 1995 totaling $5,600.

9. The Debtors state that their monthly expenses are $4,606. Included in the Debtors' expenses are $600 per month for their daughter's college tuition at Long Island University and $400 per month in charitable contributions. The Debtors have also listed a mortgage payment of $1000 per month.

*Debtors' Default on the Mortgages*

10. Pre-petition and in 1994, Bristol Oaks, L.P., one of the scheduled Mortgagors, brought an action to foreclose on the Bronx Residence in Bronx County Supreme Court. The Debtors' petition does not indicate the disposition of this foreclosure.

11. On May 20, 1996, in this Chapter 7 case, Citibank, the first Mortgagor, made a motion to lift the automatic stay to foreclose on the Bronx Residence. The Debtors did not oppose this motion. The Debtors defaulted under the Citibank note and mortgage by failing to make monthly payments of

principal and interest due from and after February 1991. As of May 20, 1996, the Debtors owed Citibank $233,000, including principal, interest and other charges. The court granted Citibank's motion and an order was signed lifting the automatic stay on June 3, 1996. On June 11, 1996, the Debtors filed a statement of intention to surrender the Bronx Residence.

*The Debtors' Transfers to the Church*

12. Crossroads Tabernacle Church is an Assemblies of God Church in the Pentecostal Christian denomination. It is located on Castle Hill Road in the Bronx.

13. The Debtors have been members of the Church congregation and choir for approximately fifteen years.

14. It is undisputed that within one year prior to the Filing Date, the Debtors transferred $5,279.30 to the Church. This amount is equal to 10% of their gross 1995 income shown in their statement of affairs.

15. The Debtors claim that their transfers to the Church were pursuant to their practice of tithing. Neither the Church nor the Debtors define this practice in their papers, except to state that "[t]hese tithes are a manifestation of the [Debtors'] belief ... in [their] religion and represent an expression of [their] adherence to our faith." *Defendant's Affidavit* (Adversary Proceeding Document ("A.P.Doc.") 3A) at ¶3; *Defendant's Memorandum in Support of its Motion* (A.P. Dec. 7A) at p. 4; *Affidavit of Antoinette Rivera* (A.P.Doc. 5A) at ¶7; *Affidavit of Benjamin Rivera* (A.P. Dec. 6A) at ¶7.

16. The Church acknowledges that it did not ask or compel the Debtors to make these transfers, nor did the Debtors enter into a contract with the Church that legally required them to do so. *Defendant's Affidavit* at ¶6. The Debtors also concede that they received no consideration and "nothing of material value" in return for their contributions. *Affidavit of Antoinette Rivera* at ¶9; *Affidavit of Benjamin Rivera* at ¶9. Finally, the Church admits that "even in the face of their apparently worsening financial condition, the Debtors' continued to donate in accordance with their religious beliefs."

*Defendant's Memorandum* at 4.

*Commencement of this Adversary Proceeding*

17. On October 28, 1996, the Trustee filed this adversary proceeding seeking to recover the Debtors' pre-petition transfers to the Church in the amount of $5,279.30, plus interest, as fraudulent transfers under § 548(a)(2) of the Code.

18. On November 27, 1996, the Church filed its motion to dismiss the Complaint pursuant to Bankruptcy Rule 7012 on the grounds that applying Code § 548(a)(2) to contributions made to religious organizations is violative of the Debtors' First Amendment rights and of RFRA and therefore, the Trustee is not entitled to recover the transfers. The Church also seeks sanctions against the Trustee. The Debtors have filed affidavits in support of the Church's motion.

19. On December 5, 1996, the Trustee filed response papers opposing the Church's motion and cross-moved for sanctions. The Church subsequently filed a reply affidavit and reply affirmation both dated December 12, 1996.

20. On December 16, 1996, the court held a hearing on the motions. At the hearing, the Trustee withdrew his motion for sanctions and the court took this matter under advisement.

## DISCUSSION

*Standards on Motion to dismiss*

The Church moves under Bankruptcy Rule 7012 which incorporates by reference Federal Rule 12(b)(6). A motion under Rule 12(b)(6) tests the formal legal sufficiency of a complaint. *See, Wright and Miller Federal Practice and Procedure,* § 1356 at 590 (1982); *In re Crazy Eddie, Inc.,* 1992 WL 406543 (Bankr.S.D.N.Y.1992) at *3. Under Rule 12(b)(6), a complaint may be dismissed only if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Carolyn McCarthy v. Olin Corp.,* 119 F.3d 148 (2d Cir.1997). The issue is not whether a plaintiff will ultimately prevail, but whether it has pleaded a cause of action sufficient to entitle it to offer evidence in support of its claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). When reviewing a motion to dismiss, the court must take all well-pleaded facts alleged in the pleadings as true, *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57 (2d Cir.1985), and must further construe the pleadings and all reasonable inferences drawn therefrom in a light most favorable to the plaintiff. *Hishon v. King & Spalding,* 467 U.S. 69, 72, 104 S.Ct. 2229 2232, 81 L.Ed.2d 59 (1984); *McCarthy,* 119 F.3d at 152; *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). The court's function is not to weigh the evidence that might be presented at a trial, but merely to determine whether the complaint itself is legally sufficient. *Festa v, Local 3, Int'l Bhd. of Elec. Workers,* 905 F.2d 35, 37 (2d Cir.1990).

*Fraudulent Transfers*

A. *Code § 548: Fraudulent Transfer Provisions*

The Trustee moves to recover the transfers to the Church under Code § 548(a)(2), which states in pertinent part:

"(a) The Trustee may avoid any transfer of an interest of the debtor in property * * * that was made * * * on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

* * *

(2) (A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B) (i) was insolvent on the date such transfer was made * * * or became insolvent as a result of such transfer * * *."

Code § 548(a)(2) is known as the "constructive fraud" provision and does not require that a debtor act with actual intent to defraud his creditors before a transfer can be avoided. *Cf.* Code § 548(a)(1) (requiring "actual intent to hinder, delay, or defraud any entity to which the debtor was or became * * * indebted").

In the instant case, the parties have stipulated that the Debtors transferred $5,279.30

to the Church during the year prior to the Filing Date. The parties have further stipulated that these transfers were made without the Debtors having received reasonably equivalent value in exchange therefore. As to the insolvency of the Debtors, not only is there a presumption of such during the ninety day period prior to the Filing Date, but the Trustee's complaint alleges that "[t]he Debtors were insolvent or became insolvent as a result of said transfers and/or said transfers were beyond the Debtors' ability to give to the Church." *Complaint* at ¶ 13. Consequently, the court finds that each required element to avoid a transfer under Code § 548(a)(2) has been well pled so as to state a cause of action.

While ordinarily such a finding would resolve this motion, the Church has argued that "even if all of the allegations made in the [Trustee's] Complaint are taken as true," the fraudulent conveyance laws do not apply to gifts made to "non-profit religious entit[ies]" like the Church. *Defendant's Affidavit* at ¶ 7, 8. In presenting its argument, the Church, with the support of the Debtors, has also implicitly urged that "tithes"[4] should be treated differently than other religious contributions.

■ The issue before the court, therefore, is whether gifts to religious organizations, and more specifically "tithes," are exempt from the fraudulent transfer provisions of the Code and are thus not recoverable by a bankruptcy trustee.

### B. *Applicability of Fraudulent Transfer Provisions*

In the instant matter, the Church concedes that "given any other circumstance, if these Debtors had made the contribution or gift to anything but a religious organization * * * this transaction would certainly be avoidable by the Trustee [under Code § 548]." *Transcript of Hearing of December 16, 1996*

(A.P.Doc. 13A) at 13. The Debtors have stated that they believe that their "tithes" are a moral obligation and a manifestation of the belief they hold in their religion. *Affidavit of Benjamin Rivera* at ¶ 7; *Affidavit of Antoinette Rivera* at ¶ 7. The Church argues that because the Debtors' gift was a "tithe" it should be afforded a special exemption under the Code and that permitting recovery of such transfers is violative of the Debtors' rights under the Free Exercise Clause of the First Amendment[5] and under RFRA. This court disagrees.

Until 1990, the constitutional law as declared by the Supreme Court instructed that the Free Exercise Clause of the First Amendment prohibited the enforcement of government statutes and regulations which effected a substantial burden on an individual's exercise of religious beliefs except when justified by a compelling interest and achieved through the least restrictive means. *See, Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Fitzgerald v. Magic Valley Evangelical Free Church (In re Hodge)*, 200 B.R. 884 (Bankr.D.Idaho 1996). However, in 1990, in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court held that facially neutral laws would no longer be subject to this level of strict scrutiny under the First Amendment.

Three years later, expressly reacting to *Smith,* Congress enacted RFRA. This statute restored the "substantial burden" "compelling interest" and "least restrictive means" tests by mandating that the government shall not "substantially burden" a person's exercise of religion unless the government demonstrates that the burden furthers a "compelling governmental interest" by the "least restrictive means." 42 U.S.C. § 2000bb–1; *In re Hodge,* 200 B.R. at 894–95.

---

4. The Eighth Circuit in *In re Young,* 82 F.3d 1407 (8th Cir.1996), *cert. granted,* —— U.S. ——, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997), a case which the Church cites in support of its position, states that "[t]ithing is a spiritual and financial practice. Believers traditionally give a tithe, or tenth, of their income to a religious organization such as a church." 82 F.3d at 1410.

5. The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *." U.S. Const., Amend. I.

However, given that RFRA was held unconstitutional by the Supreme Court in *Boerne*, the Church is left solely with the argument that permitting recovery of the contributions violates the Debtors' First Amendment rights to free exercise of their religious beliefs. In *Smith, supra*, the Supreme Court set forth the standard by which a law should be evaluated with regard to the Free Exercise Clause of the First Amendment. There, the Court held that the Clause "does not relieve an individual of the obligation to comply with a law that incidentally forbids (or requires) the performance of an act that his religious belief requires (or forbids) if the law is not specifically directed to religious practice and is otherwise constitutional as applied to those who engage in the specified act for nonreligious reasons." 494 U.S. at 872, 110 S.Ct. at 1595.

The legal concept of avoiding transfers made when a debtor is insolvent has been in existence since the Statute of Elizabeth was adopted in 1570. Clearly, the language in Code § 548 does not limit its application to exclude gifts or donations to religious organizations.

Historically, when a debtor makes a gift, "the only question is [the donor's] intent. That is because there is no proviso in favour of [the] donee." 1 Garrard Glenn, *Fraudulent Conveyances and Preferences*, ch.xv (1940) § 234, at 405. The term "gift" has

been defined as "a voluntary transfer of personal property to another made gratuitously and without consideration." Black's Law Dictionary (6th ed.1990). *See also* 1 Garrard Glenn, *Fraudulent Conveyances and Preferences*, § 263 at 451, § 265a at 454. Under the Code's definition of transfer [6] and the general definition of gift, religious contributions, including "tithes" are gifts as no consideration is proffered therefor. Thus the Code properly provides neutral treatment to all gifts, regardless of whether they are religiously motivated.

▪ The issue of tithing as it relates to Code § 548 has been a divisive and much written on area of the law.[7] However, as applied to Code § 548, this court agrees with those cases which hold that Code § 548 is a law of general applicability that neither prevents nor promotes religious practices, that its definitions are neutral toward religion and that its effect on tithing is purely incidental to the goal of equal distribution to an insolvent debtor's creditors.[8] *See In re Bloch*, 207 B.R. at 949; *In re Newman*, 203 B.R. at 475; *In re Hodge*, 200 B.R. at 902–905.

In essence the Church's contention is that the Debtors' religious motivation for contributing to the Church places them beyond the reach of Code § 548, a law that is not specifically directed at their religious practice, and that is concededly constitutional as applied to

6. Code § 101(50) defines "transfer" very broadly to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing with property or with an interest in property * * *."

7. *See Weinman v. The Word of Life Christian Ctr. (In re Bloch)*, 207 B.R. 944 (D.Colo.1997) (tithes were deemed fraudulent transfers and recoverable under the Code and Colorado state law) *Morris v. Midway Southern Baptist Church (In re Newman)*, 203 B.R. 468, 473–74 (D.Kan.1996) (tithes were deemed fraudulent transfers recoverable under the Code); *Fitzgerald v. Magic Valley Evangelical Free Church (In re Hodge)*, 200 B.R. 884 (Bankr.D.Idaho 1996) (tithes were deemed fraudulent transfers recoverable under the Code); *Cf. Christians v. Crystal Evangelical Church (In re Young)*, 82 F.3d 1407 (8th Cir.1996), *cert. granted*, —— U.S. ——, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997) (tithes were deemed fraudulent transfers under the Code but recovery of the tithes was barred under RFRA); *Ellenberg v.*

*Chapel Hill Harvester Church, Inc. (In re Moses)*, 59 B.R. 815 (Bankr.N.D.Ga.1986) (tithes were not deemed fraudulent transfers where debtors received marital and financial counseling from church); *Wilson v. Upreach Ministries (In re Missionary Baptist Foundation of America, Inc.)*, 24 B.R. 973 (Bankr.N.D.Tx.1982) (in corporate Chapter 11 case, contributions were not deemed fraudulent transfers when morale and goodwill of recipients were enhanced by contributions).

8. This court would find that Code § 548 also passed the earlier and stricter standard of *Wisconsin v. Yoder, supra*. There is no less restrictive method available to achieve the governmental interest expressed through this section of the Code nor does it impose a substantial burden on the Debtors' free exercise of religion since the burden is actually on their *non-religious* activities. It is their failure to limit their non-religious expenses to a level commensurate with their available income that creates the right to avoid the transfer.

those who make gifts for other reasons. In making this argument, the Church, with the Debtors' support, has also implied that the court should be partial to those Christian denominations which encourage the practice of tithing. The court may take judicial notice of the fact that all of the major religions in this country, including Judaism, Islam and the many denominations of Christianity, are supported by their congregants either monetarily or in some other fashion.

Accepting the Church's arguments would actually lead the court to interpret the Code in such a way that would, in fact, violate the First Amendment. First, it would require the court to determine whether a specific gift was religiously motivated or non-religiously motivated, which would impermissibly require the court to evaluate the sincerity of a debtor's religious belief. Second, it would appear to elevate religious groups which adhere to the tenet of tithing over other religious groups. Protecting only those religious groups which encourage their congregants to tithe from the scope of the fraudulent conveyance law would necessarily exclude from the scope of that protection those religious groups which have not sought the traditional one-tenth or, in fact, any other type of religiously motivated contribution which could not technically be characterized as a tithe. Indeed, some deeply religious people are motivated to make charitable gifts to organizations other than their own church by virtue of their religious beliefs.

As a result, the Code would not only lose its neutrality but would force courts to evaluate each debtor's personal or spiritual beliefs and actual religious practices in the context of his or her religion. In warning that courts must not presume to determine the place of any particular religious belief, the Supreme Court has stated that "[j]udging the centrality of different religious practices is akin to the unacceptable 'business of evaluating the relative merits of differing religious claims.'" *Smith*, 494 U.S. at 887, 110 S.Ct. at 1604. To retain its neutrality, therefore, the Code must be applied to all gifts in the same manner, irrespective of the type of gift, of the amount of the gift or of the identity of the donee. As a result, the court finds the Church's argument that permitting the recovery of the Debtors' transfers would violate their rights under the First Amendment without merit.

These Debtors appear to have been in financial distress for several years before their Chapter 7 filing. In the year prior to filing, these Debtors earned a combined income of $52,672. They earned $67,922 in the year prior to that. While the court takes note of the fact that their income did decrease by approximately $15,000, due apparently to the disability of the wife, their difficulties in paying their Mortgages predates this reduction in income.

The Debtors had not paid at least two of the three Mortgages on their home for a number of years prior to the Filing Date and a foreclosure action had been commenced in 1994. Given the Debtors' acknowledged history of tithing to the church, it is conceivable that in the five years prior to filing, these Debtors donated approximately $25,000 to the Church, an amount which may well have been sufficient to avoid default on the Mortgages. Moreover, during this period the Debtors continued to live in the house, owned two cars and sent their daughter to a private college. The Debtors even borrowed money from family and friends.

Our society encourages its citizens to give to charity for those who are in need or who are less fortunate. Our society also allows its citizens freedom of religion under the First Amendment and the freedom to support religious institutions financially. There is nothing inherently wrong in giving gifts to charitable organizations or religious institutions. However, that does not preclude providing a remedy to recover gifts made by an insolvent, whether those gifts were religiously motivated or not.

While freedom to believe is absolute, freedom to act is not. The latter is subject to regulation for the protection of society. *Brown v. McGinnis*, 10 N.Y.2d 531, 225 N.Y.S.2d 497, 180 N.E.2d 791 (1962). Code

§ 548 does not dictate unreasonable rules with respect to how we live our personal lives. The section serves a very important policy which in effect says that prior to the time a debtor files a petition, a debtor cannot give his or her assets away, whether it is to a church or to anyone else, when it is at the expense of paying creditors.[9] This is not a burden on religion. It is a burden on choice. If individuals choose to donate part of their income to charity, whether religious or secular, they must adjust their expenditures accordingly to live within the confines of their available income.

The First Amendment of the Constitution mandates the separation of church and state. Consistent with this principle, the bankruptcy court must apply Code § 548 to all transferees, religious institutions or not. In doing so, the court adheres to the expectation that an insolvent should be "just to his creditors before he is generous to others." 1 Garrard Glenn, *Fraudulent Conveyances and Preferences, supra,* § 264 at 451.

### CONCLUSION

The Church's motion to dismiss the Complaint is denied as is its request for sanctions against the Trustee.

Prevailing party to settle order.

---

**9.** Moreover, if there were no bankruptcy case, the Debtors' creditors would be free to commence their own fraudulent conveyance action against the Church under the fraudulent conveyance provisions of the New York Debtor and Creditor Law. *See* §§ 270–281 (McKinneys 1990 and Supp.1997). Only upon the filing of a bankruptcy petition does the right to prosecute fraudulent conveyance actions pass to the bankruptcy trustee. 5 *Collier on Bankruptcy* ¶ 548.06 (Lawrence P. King ed., 15th ed.1997); *see also Glenny v. Langdon,* 98 U.S. 20, 25 L.Ed. 43 (1878) (right to bring fraudulent transfer action vested on trustee; thus, action cannot be brought by creditors acting alone and without court's express permission).